1  BRIAN L. DAVIDOFF (State Bar No. 102654)
   DAVID Y. JOE (State Bar No. 206507)
2  RUTTER HOBBS & DAVIDOFF
     INCORPORATED
3  1901 Avenue of the Stars
   Suite 1700
4  Los Angeles, CA 90067
   Telephone:  (310) 286-1700
5  Facsimile:  (310) 286-1728

6  Attorneys for Gomes Enterprises, LLC, d/b/a A to Z Metals
   Alleged Debtor
7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11 In re:                          )  Bankruptcy Case No. 2:10-bk-14738-RN
                                    )
12                                  )  Involuntary Chapter 7
                                    )
13 GOMES ENTERPRISES, LLC, d/b/a    )  ALLEGED DEBTOR'S EMERGENCY
   A TO Z METALS                    )  MOTION FOR ORDER APPROVING
14                                  )  STIPULATION (1) AUTHORIZING
                                    )  CONTINUED USED OF FUNDS; AND (2)
15                                  )  GRANTING OF POST-PETITION LIENS
              Alleged Debtor.       )  AND ADEQUATE PROTECTION TO
16                                  )  SECURED LENDER; DECLARATIONS OF
                                    )  SAM LEE AND DAVID JOE IN SUPPORT
17                                  )  THEREOF
                                    )
18                                  )  Date:   February __, 2010
                                    )  Time:
19                                  )  Dept.:  Courtroom 1652
                                    )          255 East Temple Street
20                                  )          Los Angeles, CA  90012
                                    )
21                                  )
                                    )  [HEARING TO BE SET]
22                                  )
                                    )
23 _____ )

24 TO THE HONORABLE RICHARD M. NEITER, UNITED STATES BANKRUPTCY JUDGE, THE

25 UNITED STATES TRUSTEE, AND TWENTY LARGEST UNSECURED CREDITORS:

26        Pursuant to Local Bankruptcy Rule 9075-1(a), Gomes Enterprises, LLC, a California

27 limited liability company, d/b/a A to Z Metals, alleged Debtor herein ("A to Z" or "Alleged

28 Debtor"), hereby files this emergency motion ("Motion") seeking the approval of that certain

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

{7704.005-636352.DOC-(2)}

1   stipulation, a copy of which is attached hereto as Exhibit "1" ("Stipulation"), by and between

2   the Alleged Debtor and its secured lender, U.S. Bank National Association ("U.S. Bank" or

3   "Lender"), granting U.S. Bank post-petition liens and other adequate protection as a result of

4   the continued use by the Alleged Debtor of U.S. Bank's collateral and the proceeds thereof to

5   pay various necessary expenses of the Alleged Debtor (many of which are payable on a daily

6   basis) (collectively, "Necessary Expenses").

7        Beginning in August 2009, the Alleged Debtor was over-advanced in the approximate

8   amount of $10 million on its loan agreement with U.S. Bank, the senior secured creditor.  At

9   that time the Alleged Debtor entered into a forbearance agreement with U.S. Bank pursuant

10   to which U.S. Bank allowed the Alleged Debtor to use cash collections on U.S. Bank's

11   collateral so that Alleged Debtor could continue to operate.  Notwithstanding the involuntary

12   bankruptcy filing by the junior creditor Hanmi Bank (which commenced this case), U.S. Bank

13   is still willing to agree to the terms of the forbearance agreement on substantially similar

14   terms so long as it receives adequate protection.  The Alleged Debtor and U.S. Bank have

15   accordingly entered into the Stipulation (referred to below) essentially to continue the

16   process that has been occurring since last year in lieu of U.S. Bank filing a relief from stay

17   motion (so long as the Stipulation is approved).

18        U.S. Bank has placed an administrative freeze on all of the Alleged Debtor's accounts

19   at U.S. Bank, which has effectively eliminated the Alleged Debtor's liquidity.  U.S. Bank has

20   indicated that in the absence of approval of the Stipulation it will make a motion for relief

21   from the automatic stay to enforce its pre-petition rights to seize its collateral.[1]  However,

22   U.S. Bank is willing to make funds available to pay Necessary Expenses provided that it

23   receives adequate protection of collateral usage by the Alleged Debtor and other protection

24   as provided in the Stipulation.  The Alleged Debtor must be able to promptly pay the

25   Necessary Expenses to avoid immediate and irreparable harm to its business and enterprise

26   value.

27

28

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

[1] *Citizens Bank of Maryland vs Strumpf*, 516 U.S. 16 (1995) provides that an administrative freeze does not violate the stay provided that the creditor promptly moves for relief from stay.

EMERGENCY MOTION FOR ORDER APPROVING STIPULATION

{7704.005-636352.DOC-(2)}

1    It is imperative that the Alleged Debtor obtain immediate Court approval for the

2   Stipulation as critical portions of the Alleged Debtor's business operations have already

3   ceased due to the Alleged Debtor's lack of liquidity.  Prolonging, even briefly, this period of

4   cessation in the Alleged Debtor's operations will have devastating consequences for the

5   Alleged Debtor and severely limit the chances that the Alleged Debtor can continue to

6   operate as a going concern.  Therefore, the Alleged Debtor respectfully requests the Court

7   enter an order on an emergency basis:

8    (A)    Approving the Stipulation; and

9    (B)    Granting such other and further relief as the Court deems just and proper under

10   the circumstances of this case.

11    In support of this Motion, the Alleged Debtor submits the Declarations of Sam Lee and

12   David Joe and further represents as follows.

13    **I.**

14    **BACKGROUND**

15   A.    The Involuntary Chapter 7 Filing.

16    On February 10, 2010 (the "Petition Date"), Hanmi Bank ("Hanmi"), as sole

17   petitioning creditor, filed an Involuntary Petition against the Alleged Debtor in accordance

18   with section 303 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* ("Bankruptcy

19   Code"), thereby commencing this bankruptcy case (the "Involuntary Case").[2]  An Order for

20   Relief has not been entered in the Involuntary Case.

21   B.    General Description of the Alleged Debtor.

22    The Alleged Debtor is a California limited liability company with three (3) members.

23   Sam Lee, an individual ("Lee"), and David Gomes, an individual ("Gomes"), each own a 40%

24   membership interest.  Steve Hwang, an individual ("Hwang"), owns a 20% membership

25   interest.  The Alleged Debtor's main facility is located in Compton, California.

26

27   [2] The Alleged Debtor believes Hanmi should have had reason to know that the Alleged Debtor has more than 12
creditors and thus has not validly filed the Involuntary Petition.  For this reason, and others, the Alleged Debtor
believes the Bankruptcy Case may have been commenced by Hanmi in bad faith.  The Alleged Debtor reserves
its rights under 11 U.S.C. §303(i).

RUTTER 28
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS    {7704.005-636352.DOC-(2)}
-3-
EMERGENCY MOTION FOR ORDER APPROVING STIPULATION

1        The Alleged Debtor purchases used ferrous and non-ferrous scrap metal from the

2    general public, dealers and vendors.  It generates revenue by sorting, processing and

3    consolidating metals for resale to domestic and international recycled metals customers, or

4    by acting as a broker in a purchase and sale transaction.  Pricing reflects the current

5    commodities market for each particular metal and terms range from cash-in-advance to

6    typical 30 day terms, sometimes backed by letters of credit.  Currently, the Alleged Debtor

7    generates approximately 50% of its revenue by reselling metal acquired from the general

8    public via its "dock" operations ("Dock Operations"), in which members of the public

9    exchange scrap metal at the Alleged Debtor's dock for cash.  The Dock Operations are a

10    critical way in which the Alleged Debtor acquires inventory.  As the Alleged Debtor has

11    operated over the past year, approximately $50,000 in cash is required on a daily basis to

12    sustain the Dock Operations.

13        Approximately 40% of the Alleged Debtor's revenue is generated by reselling metal

14    acquired through its dealer transactions, whereby dealers sell and physically ship inventory to

15    the Alleged Debtor.  The Alleged Debtor's remaining revenue (approximately 10% of total

16    revenue) is generated through various brokered transactions.  In these transactions, the

17    Alleged Debtor does not physically take possession of the metal – rather, it finds a willing

18    seller and a willing buyer, and then typically arranges for shipment of the metal from seller

19    to buyer.

20    C.    Financial Condition of Alleged Debtor.

21        As of December 31, 2009, the Alleged Debtor had accounts receivable of $1,517,335;

22    inventory of $3,230,305; property and equipment of $9,396,159; and other assets of

23    $322,278.  Thus, total assets of the Alleged Debtor as of December 31, 2009 equaled

24

25

26

27

28

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

{7704.005-636352.DOC-(2)}

EMERGENCY MOTION FOR ORDER APPROVING STIPULATION

11,353,815.[3] As of the date of the Petition Date, the Alleged Debtor had accounts payable totaling $2,901,163.52.[4]

D.    Affiliates of the Alleged Debtor.

A to Z has two (2) affiliates relevant to the relief requested in this Motion. SLE Metal Inc., a California corporation ("SLE"), is a California corporation with two (2) shareholders. Lee owns a 66.66% interest in SLE, while Hwang owns a 33.34% interest in SLE.[5]

Unlimited Metals, Inc., a California corporation ("UMI"), is a California corporation with the same ownership as the Alleged Debtor. UMI's operations are located in the downtown Los Angeles area. Lee and Gomes each own a 40% interest in UMI, while Hwang owns a 20% interest. UMI acquires metals solely from the general public through its own dock operations. Approximately 90% of UMI's inventory is sold to the Alleged Debtor at a discounted price. As noted in footnote 5 below, UMI's inventory is included in the borrowing base calculation made pursuant to the Forbearance Agreement.

E.    U.S. Bank Loans.

On various dates beginning on or about December, 2004, U.S. Bank provided the following loans to the Alleged Debtor (collectively, the "USB Loans"):

1.    Pursuant to a Term Loan Agreement dated as of December 16, 2004 (as amended from time to time, "Term Loan Agreement A") by and between the Alleged Debtor and U.S. Bank, U.S. Bank made a loan to the Alleged Debtor. The loan is evidenced by, among other things, that certain Term Note dated December 16, 2004 made payable to U.S. Bank in the stated principal amount of $875,000 and issued pursuant to Term Loan Agreement A (as such note

---

[3] The calculation of total assets assumes: (i) $125,503 of the accounts receivable is bad debt and will not be collected; (ii) the property and equipment has accumulated depreciation of $2,940,019; and (iii) the Alleged Debtor has negative cash in the amount of $46,740.

[4] Prior to the filing of the Involuntary Petition by Hanmi, the Alleged Debtor issued a number of checks (totaling $466,285.87) which were not cashed as of the Petition Date (collectively, the "Outstanding Checks"). As a result of the administrative freeze placed on the Alleged Debtor's accounts, none of the Outstanding Checks can currently be negotiated. The $2,901,163.52 number does not include the amount of the Outstanding Checks.

[5] On or about June 25, 2009, SLE filed a voluntary chapter 7 case in the United States Bankruptcy Court for the Central District of California, Case No. 09-bk-16252-RK

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

-5-

EMERGENCY MOTION FOR ORDER APPROVING STIPULATION

{7704.005-636352.DOC-(2)}

has been amended from time to time, "Term Note A").  Term Loan Agreement

A and Term Note A were amended by that certain Amendment to Loan

Agreement and Note dated as of May 22, 2007.

2.    Pursuant to a Term Loan Agreement dated as of August 30, 2005 (as

amended from time to time, "Term Loan Agreement B") by and between the

Alleged Debtor and U.S. Bank, U.S. Bank made a loan to the Alleged Debtor.

The loan is evidenced by, among other things, that certain Term Note dated

August 30, 2005 made payable to U.S. Bank in the stated principal amount of

$500,000 and issued pursuant to Term Loan Agreement B (as such note has

been amended from time to time, "Term Note B").  Term Loan Agreement B

and Term Note B were amended by that certain Amendment to Loan

Agreement and Note dated as of May 22, 2007.

3.    Pursuant to an Amended and Restated Credit Agreement dated as of October

16, 2006 (as amended from time to time, "Credit Agreement"; and together

with Term Loan Agreement A and Term Loan Agreement B, collectively, the

"A to Z Loan Agreements"), U.S. Bank agreed to make certain loans to the

Alleged Debtor.  The Credit Agreement was amended by those certain

amendments dated as of March 28, 2007; May 29, 2007; September 19,

2007; December 12, 2007; December 28, 2007; February 27, 2008; August

22, 2008; September 23, 2008; and January 13, 2009 (the "Amendments").

4.    The loans made pursuant to the Credit Agreement are evidenced by, among

other things, (i) that certain Equipment Refinance Term Note dated

December 12, 2007 made payable to U.S. Bank in the stated principal amount

of $1,200,000 and issued pursuant to the Credit Agreement (as such note has

been amended from time to time, "Term Note C"), (ii) that certain Revolving

Credit Note dated January 13, 2009 made payable to U.S. Bank in the stated

principal amount of $18,400,000 and issued pursuant to the Credit

Agreement (as such note has been amended from time to time, the "Revolving

EMERGENCY MOTION FOR ORDER APPROVING STIPULATION

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

{7704.005-636352.DOC-(2)}

1    Note"), (iii) that certain Term Note dated December 28, 2007 made payable

2    to U.S. Bank in the stated principal amount of $2,549,998 and issued

3    pursuant to the Credit Agreement (as such note has been amended from time

4    to time, "Term Note D"); and (iv) that certain 2008 Term Note dated

5    September 23, 2008 made payable to U.S. Bank in the stated principal

6    amount of $675,000 and issued pursuant to the Credit Agreement (as such

7    note has been amended from time to time "2008 Term Note").

8    5.    Term Note A, Term Note B, Term Note C, Term Note D and the 2008 Term

9    Note may be collectively referred to herein as the "Term Notes", and the

10    Revolving Note and the Term Notes may be collectively referred to herein as

11    the "Notes."

12    To secure performance of the Alleged Debtor's obligations under the A to Z Loan

13 Agreements and the Notes, the Alleged Debtor made, executed and delivered to U.S. Bank an

14 Amended and Restated Business Security Agreement dated as of October 16, 2006 (the "USB

15 Security Agreement"). The USB Security Agreement grants a security interest (the "USB

16 Security Interest") in the personal property described therein (the "USB Collateral"). U.S.

17 Bank properly perfected its security interest as described in the USB Security Agreement by,

18 among other things, filing a Uniform Commercial Code financing statement with the

19 California Secretary of State on December 15, 2003 as document no. 03-35360858, which

20 was duly continued by the filing of a continuation statement on July 7, 2008 as document

21 no. 08-7164110 (as amended and/or continued from time to time, the "USB Financing

22 Statement").

23    The USB Loans were guaranteed by the following guarantors:

24    a.    UMI guaranteed the USB Loans pursuant to that certain Amended and

25    Restated Corporate Guarantee Agreement dated as of October 16, 2006 in

26    favor of U.S. Bank (the "UMI USB Guarantee"). To secure performance of its

27    obligations under the UMI USB Guarantee, UMI made, executed and

28

RUTTER
HOBBS 🔳
DAVIDOFF
INCORPORATED
L A W Y E R S    {7704.005-636352.DOC-(2)}

-7-

1   delivered to U.S. Bank a General Business Security Agreement dated as of

2   October 16, 2006 (the "UMI USB Security Agreement").

3       b.    Hwang guaranteed the USB Loans pursuant to that certain Amended and

4   Restated General Guarantee dated as of October 16, 2006 in favor of U.S.

5   Bank (the "Hwang Guarantee").

6       c.    Lee guaranteed the USB Loans pursuant to that certain Amended and

7   Restated General Guarantee dated as of October 16, 2006 in favor of U.S.

8   Bank (the "Lee Guarantee").

9       d.    Gomes guaranteed the USB Loans pursuant to that certain Amended and

10   Restated General Guarantee dated as of October 16, 2006 in favor of U.S.

11   Bank (the "Gomes Guarantee"). Lee, Hwang, and Gomes may be collectively

12   referred to herein as the "Individual Guarantors".

13       e.    The Gomes Guarantee, the Lee Guarantee and the Hwang Guarantee may be

14   collectively referred to herein as the "Individual USB Guarantees, and

15   together with the UMI USB Guarantee, the "USB Guarantees."

16       The A to Z Loan Agreements, Notes, USB Security Agreement, USB Financing

17   Statement, USB Guarantees, UMI USB Security Agreement and any other documents

18   executed in connection therewith may be collectively referred to herein as the as the "USB

19   Loan Documents."

20       The USB Loans are the Alleged Debtors primary source of financing. As of February

21   12, 2010 the outstanding principal amount of the Revolving Note and the Term Notes are

22   $13,148,892.91 and $2,230,030.24, respectively.

23       As a result of the approximately $10 million overadvance (which has subsequently

24   been reduced minimally), on July 30, 2009 and August 5, 2009, U.S. Bank notified the

25   Alleged Debtor by letter of a default under the USB Loans and accelerated all of the

26   obligations owing to U.S. Bank. At the request of the Alleged Debtor, U.S. Bank agreed to

27   forbear from exercising its default rights and remedies pursuant to the terms set for in that

28   certain Forbearance Agreement dated as of August 10, 2009 (the "Forbearance Agreement")

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

1 | among the Alleged Debtor, certain others and U.S. Bank (a copy of which is attached to the

2 | Stipulation as <u>Exhibit A</u>).  The Forbearance Agreement generally provided for the following:

3 |     I.        All of the Alleged Debtor's collections would be deposited into a blocked

4 |                 account at U.S. Bank.

5 |     II.       U.S. Bank would release funds from the blocked account and permit them to

6 |                 be used by the Alleged Debtor *so long as*, among other things, the

7 |                 "overadvance"[6] did not increase from a baseline level, the outstanding

8 |                 amount of the revolving credit note was reduced by $3,000 per day (which

9 |                 U.S. Bank was permitted to deduct from the deposit account), and principal

10 |                 and interest payments to U.S. Bank were kept current.

11 |     III.      If the overadvance increased from the baseline, U.S. Bank could apply funds

12 |                 from the deposit account to reduce the overadvance to the baseline level.

13 | At all times, the Alleged Debtor has worked closely with U.S. Bank in an effort to

14 | increase the profitability of the company, which inures to the benefit the Alleged Debtor, U.S.

15 | Bank and other creditors of the Alleged Debtor.  To this end, since August, 2009 until the

16 | Petition Date, U.S. Bank has continued to release funds for the Alleged Debtor to use in its

17 | business operations, at certain times notwithstanding that according to its terms the

18 | Forbearance Agreement was to expire no later than September 30, 2009.

19 | F.    <u>The Alleged Debtor's Guarantee of Hanmi Loans</u>.

20 | On various dates beginning on or about March, 2007, Hanmi made three (3) loans to

21 | SLE Metals, Inc ("SLE") as borrower, in the aggregate principal amount of approximately

22 | $19,500,000 (collectively, the "Hanmi Loans") pursuant to various notes and other

23 | documents (collectively, the "Hanmi Loan Documents").  As additional security for some or

24 | all of the Hanmi Loans, the Alleged Debtor guaranteed the Hanmi Loans and granted Hanmi

25 | a security interest in some or all of the Alleged Debtor's personal property ("Hanmi Security

26 | Interest").  The Hanmi Security Interest is junior and subordinate to the USB Security

---

[6] The overadvance is the amount by which the outstanding amounts owed to U.S. Bank exceed the borrowing base.  The borrowing base includes collateral of both the Alleged Debtor and an affiliate, Unlimited Metals, Inc., a California corporation.

{7704.005-636352.DOC-(2)}

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

1  Interest. Because the amount of the USB Loans greatly exceeds the value of the Alleged

2  Debtor's personal property collateral (which is the same collateral securing some or all of the

3  Hanmi Loans), the Hanmi Loans are wholly unsecured.[7]

4  G.    State of Affairs Prior to Involuntary Chapter 7 Filing.

5        Over the past few years, A to Z's business has slowed due to the difficult economic

6  environment. At all times prior to the commencement of the Involuntary Case, the Alleged

7  Debtor has worked closely with U.S. Bank towards the mutual goal of increased profitability

8  for the Alleged Debtor. To this end, U.S. Bank has continued to release funds to be used by

9  the Alleged Debtor, at certain times notwithstanding U.S. Bank's position that the Alleged

10  Debtor was in default under the Forbearance Agreement.

11        Now, however, as a result of the commencement of the Involuntary Case by Hanmi

12  and the implications of 11 U.S.C. § 552,[8] U.S. Bank placed an administrative freeze on the

13  Alleged Debtor's deposit accounts thereby eliminating the Alleged Debtors liquidity.

14                                    II.

15                    **STIPULATION; RELIEF REQUESTED**

16        Before the involuntary petition was filed, the parties were operating under the

17  Forbearance Agreement, pursuant to which Alleged Debtor was allowed to use collections so

18  that it could operate. U.S. Bank is willing to continue doing so post-petition. The Stipulation

19  continues (with certain changes noted herein and in the Stipulation) the pre-petition

20  arrangement. However, as a condition to entering into the Stipulation, U.S. Bank requires,

21  and is entitled to receive, adequate protection under Bankruptcy Code Sections 361 and 362.

22  Moreover, because Bankruptcy Code Section 552 cuts off pre-petition security interests

23  (except for proceeds), U.S. Bank has requested adequate protection in the form of post

24

25

26  [7] This further begs the question of what Hanmi has to gain by commencing the Bankruptcy Case, and whether
the involuntary petition was filed in good faith.

27

[8] 11 U.S.C. § 552(a) provides in part: "[e]xcept as provided in subsection (b) of this section, property acquired
by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any
security agreement entered into by the debtor before the commencement of the case."

RUTTER 28
HOBBS &
DAVIDOFF
I N C O R P O R A T E D
L A W Y E R S          {7704.005-636352.DOC-(2)}

-10-

EMERGENCY MOTION FOR ORDER APPROVING STIPULATION

1  petition liens on its collateral and the proceeds thereof that are going to be used by Alleged

2  Debtor.

3           The Stipulation provides, among other things, as follows:

4      1.       The Forbearance Agreement  shall apply effective as of the Petition Date until

5               the Termination Date (as defined in the Stipulation), and the Alleged Debtor

6               shall comply and continue to comply with all of its obligations thereunder,

7               with the following additions and changes:

8               a.    The automatic stay imposed by 11 U.S.C. §362 shall be modified to

9                     permit U.S. Bank to take all actions contemplated by the Forbearance

10                    Agreement or the Stipulation except for exercising its rights and

11                    remedies against the Alleged Debtor or its assets on account of any

12                    default under the Forbearance Agreement or the Stipulation.

13              b.    The Alleged Debtor shall close its existing general account at U.S. Bank

14                    and open a new general account at U.S. Bank, which new general

15                    account shall be the account into which any funds the Alleged Debtor is

16                    permitted to use pursuant to the Forbearance Agreement shall be

17                    deposited.  Any funds in the existing general account shall be transferred

18                    to the new general account.

19              c.    The Alleged Debtor shall not pay any pre-Petition Date obligations, other

20                    than any that are specifically identified as such in the Budget (as defined

21                    below) or that are otherwise approved in writing by U.S. Bank in its sole

22                    and absolute discretion.

23              d.    The Alleged Debtor may use funds only in accordance with the budget

24                    attached to the Stipulation as <u>Exhibit B</u> (and such modifications thereto

25                    or supplements thereto for subsequent periods, but in each case only if

26                    and to the extent approved in writing by U.S. Bank in its sole and

27                    absolute discretion) (collectively, the "Budget"), and shall at all times

28                    operate within the Budget, subject only to cumulative variances after the

RUTTER
HOBBS ▧
DAVIDOFF
INCORPORATED
L A W Y E R S     {7704.005-636352.DOC-(2)}

Petition Date of no more than 15% for aggregate income, 15% for each

expenditure line item, and 10% for aggregate expenditures, in each case

unless otherwise agreed in writing by U.S. Bank in its sole and absolute

discretion.  The Alleged Debtor shall provide U.S. Bank with weekly

reports, on or before Tuesday of each week, reflecting weekly and

cumulative post-Petition Date results and variances from the Budget,

with the same level of detail as the Budget.

e.   All references to "the Consolidated Overadvance set forth in the

Consolidated Baseline Borrowing Base Certificate" shall be changed to

"$9,794,000, less $3,000 per day (Monday through Friday) after

February 12, 2012."

2.   As adequate protection under Bankruptcy Code §§ 361 and 362 for, and to

secure repayment by the Alleged Debtor to U.S. Bank of the amount of: (i)

any cash used by the Alleged Debtor after the Petition Date in which U.S.

Bank how or hereafter has a security interest or lien (including pursuant to

the adequate protection lien granted herein); and (ii) any decrease in the

aggregate value of U.S. Bank's interest in the USB Collateral and the proceeds

thereof from that existing on the Petition Date (the amounts of clauses (i) and

(ii) being collectively referred to as the "Adequate Protection Amount"), the

Alleged Debtor grants U.S. Bank a continuing security interest and lien upon,

and a right of setoff against, and the Alleged Debtor pledges and assigns to

U.S. Bank, (a) all of the Alleged Debtor's pre-petition and post-Petition Date

personal property assets; (b) all products and proceeds thereof in whatever

form and wherever located, including, without limitation, all insurance

proceeds and all claims against third parties for loss or destruction of damage

to any such assets or any portion thereof; and (c) any avoidance actions (and

the proceeds thereof) under 11 U.S.C. §549(a) resulting from any payments

or other transfers after the Petition Date of or from the USB Collateral or the

-12-

{7704.005-636352.DOC-(2)}

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
LAWYERS

1          assets in which U.S. Bank is given an adequate protection lien (clauses (a),

2          (b) and (c) being referred to collectively as the "Adequate Protection

3          Collateral"). Without limiting the foregoing, the Adequate Protection

4          Collateral includes without limitation the assets described in the Security

5          Agreement, a copy of which is attached to the Stipulation as Exhibit C, and all

6          provisions of the Security Agreement shall apply to the Adequate Protection

7          Collateral.

8      3.      As further adequate protection and security for, and to the extent of, the

9          Adequate Protection Amount: (i) U.S. Bank shall have and is granted a

10         priority claim under Bankruptcy Code § 507(a)(3) and Bankruptcy Code

11         § 502(f) for any and all claims that U.S. Bank has against the Alleged Debtor

12         under the Stipulation; and (ii) U.S. Bank shall be entitled to administrative

13         priority status pursuant to Bankruptcy Code § 507(b) with priority and super-

14         priority over any and all other priority claims, administrative expenses, or

15         other claims against the Alleged Debtor whatsoever, heretofore or hereafter

16         arising or incurred in the Case, or in any superseding case or cases under

17         Chapters 7 or 11 of the Bankruptcy Code.

18      The Alleged Debtor must be able to promptly pay all Necessary Expenses as set forth

19 in the Budget[9] to avoid immediate and irreparable harm. It is imperative that the Alleged

20 Debtor obtain immediate Court approval for the Stipulation as critical portions of the Alleged

21 Debtor's business operations have already ceased due to the Alleged Debtor's lack of liquidity.

22 Prolonging, even briefly, this period of cessation in the Alleged Debtor's operations will have

23 devastating consequences for the Alleged Debtor and severely limit the chances that the

24 Alleged Debtor can continue to operate as a going concern. Although U.S. Bank has placed

25 an administrative freeze on the Alleged Debtor's deposit accounts and effectively eliminated

26 the Alleged Debtor's liquidity, U.S. Bank is willing to make funds available to pay Necessary

27

28

[9] Necessary Expenses include, without limitation, cash required to fund the Alleged Debtor's Dock Operations, payroll and payment to certain vendors.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

{7704.005-636352.DOC-(2)}

1  Expenses provided that it receives adequate protection of its collateral and other protection

2  as set forth in the Stipulation.  The Stipulation provides a framework acceptable to both the

3  Alleged Debtor and U.S. Bank and, because it allows for the continued operation of the

4  Alleged Debtor, saves jobs and may benefit the Alleged Debtor's other creditors.  By contrast,

5  if the Alleged Debtor does not continue to operate, the Alleged Debtor's employees will lose

6  their jobs and the Alleged Debtor's creditors will receive nothing.  Thus, the Alleged Debtor

7  hereby seeks an order approving the Stipulation on an emergency basis.

8  **III.**

9  **USE OF FUNDS SHOULD BE AUTHORIZED FOR PAYMENT OF NECESSARY EXPENSES**

10  **IN ACCORDANCE WITH THE STIPULATION**

11  An involuntary debtor is typically able to continue operating its business in the period

12  between the petition date and the order for relief without court approval, notwithstanding

13  that this may involve the use of a creditor's collateral and the proceed thereof.

14  See 11 U.S.C. § 303(f), which provides:

15  "[n]otwithstanding section 363 of this title, except to the extent

16  that the court orders otherwise, and until an order for relief in the

17  case, any business of the debtor may continue to operate, and the

18  debtor may continue to use, acquire, or dispose of property as if

19  an involuntary case concerning the debtor had not been

20  commenced."

21  However, here, U.S. Bank has effectively eliminated the Alleged Debtor's liquidity and

22  its ability to continue business operations by placing an administrative freeze on the Alleged

23  Debtor's deposit accounts at U.S. Bank.  U.S. Bank asserts that, because of defaults under the

24  Forbearance Agreement, it is not required to release any funds.  U.S. Bank also asserts that,

25  but for the automatic stay under 11 U.S.C. §362, it is entitled to exercise its pre-Petition Date

26  rights under the USB Loan Documents and the Forbearance Agreement to seize its collateral.

27  U.S. Bank is however willing to release funds required for the Alleged Debtor to pay

28  the Necessary Expenses provided that it receives protection from any dilution of U.S. Bank's

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

{7704.005-636352.DOC-(2)}

-14-

1  pre-Petition Date collateral as a result of the Alleged Debtor use thereof (i.e., sells metal, or
2  buys metal with cash) by providing U.S. Bank with:

3      1.    A replacement lien on post-Petition Date assets;

4      2.    A lien on any avoidance action recoveries that may be made under 11 U.S.C.
5          § 549(a)[10] as a result of transfer made using U.S. Bank's pre-Petition Date
6          collateral, potentially leaving U.S. Bank without a security interest in the
7          property recovered thereby; and

8      3.    Other protection set forth in the Stipulation pending any decision on the
9          Involuntary Petition.

10  Under 11 U.S.C. § 362, a party in interest that is otherwise subject to the
11  automatic stay may obtain relief from stay if such party lacks adequate
12  protection of its interest in property of the debtor.

13  11 U.S.C. § 361 provides that when adequate protection is required
14  under section 362, a bankruptcy court has the authority to, among other things,
15  grant a party in interest an additional or replacement lien to the extent the stay
16  results in a decrease in value of such party's interest in the property of debtor
17  or grant such other relief as will result in the realization by the party in interest
18  of the indubitable equivalent of such party's interest in the property of debtor.

19  See 11 U.S.C. § 361, which states in part:

20      "[w]hen adequate protection is required under section 362, 363,
21      or 364 of this title of an interest of an entity in property, such
22      adequate protection may be provided by…

23          (2) providing to such entity an additional or replacement
24          lien to the extent that such stay, use, sale, lease, or grant

---

[10] 11 U.S.C. § 549(a) provides: "Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
(1) that occurs after the commencement of the case; and
(2) (A) that is authorized only under section 303(f) or 542(c) of this title; or
(B) that is not authorized under this title or by the court.

RUTTER
HOBBS
DAVIDOFF
INCORPORATED
LAWYERS

{7704.005-636352.DOC-(2)}

-15-

1    results in a decrease in the value of such entity's interest in

2    such property; or

3    (3) granting such other relief, other than entitling such

4    entity to compensation allowable under section 503 (b)(1)

5    of this title as an administrative expense, as will result in

6    the realization by such entity of the indubitable equivalent

7    of such entity's interest in such property."

8    Moreover, the Court may use the power granted it by 11 U.S.C. § 105(a) to issue an

9    order approving the Stipulation.  In this regard, 11 U.S.C. § 105(a) provides:

10    "[t]he court may issue any order, process, or judgment that is

11    necessary or appropriate to carry out the provisions of this title.

12    No provision of this title providing for the raising of an issue by a

13    party in interest shall be construed to preclude the court from,

14    sua sponte, taking any action or making any determination

15    necessary or appropriate to enforce or implement court orders or

16    rules, or to prevent an abuse of process."

17    Therefore, the Stipulation, which allows for the release of funds required to pay the

18    Necessary Expenses, addresses the foregoing concerns of U.S. Bank and is limited and

19    reasonable under the circumstances, should be approved pursuant to power granted the

20    Court under 11 U.S.C. §§ 361 and 362.

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28

RUTTER
HOBBS ☒
DAVIDOFF
INCORPORATED
L A W Y E R S

{7704.005-636352.DOC-(2)}

EMERGENCY MOTION FOR ORDER APPROVING STIPULATION

## CONCLUSION

BASED ON THE FOREGOING, the Alleged Debtor respectfully requests an order of the Court:

    (A)    Approving the Stipulation; and

    (B)    Granting such other and further relief as the Court deems just and proper under the circumstances of this case.

Respectfully submitted,

DATED:  February 17, 2010

RUTTER HOBBS & DAVIDOFF
  INCORPORATED

By _____
    BRIAN L. DAVIDOFF
    DAVID Y. JOE
    Attorneys for GOMES ENTERPRISES, LLC,
    d/b/a A TO Z METALS
    Alleged Debtor

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

{7704.005-636352.DOC-(2)}

EMERGENCY MOTION FOR ORDER APPROVING STIPULATION

### DECLARATION OF SAM LEE

I, Sam Lee, declare as follows:

1.     I am the owner of forty percent (40%) of the membership interests of Gomes Enterprises, LLC, a California limited liability company, d/b/a A to Z Metals ("A to Z"). I am actively involved in the business operation of A to Z. All matters stated herein are known to me by first hand knowledge, except for those stated upon information and belief. If called upon as witness, I could and would competently testify thereto.

2.     I make this Declaration in support of ALLEGED DEBTOR'S EMERGENCY MOTION FOR ORDER APPROVING STIPULATION (1) AUTHORIZING CONTINUED USED OF FUNDS; AND (2) GRANTING OF POST-PETITION LIENS AND ADEQUATE PROTECTION TO SECURED LENDER (the "Motion"). Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

3.     A to Z has three (3) members, including myself. The other two members are David Gomes, an individual ("Gomes"), who owns a 40% membership interest and Steve Hwang, an individual ("Hwang"), who owns a 20% membership interest. A to Z's main facility is located in Compton, California.

4.     A to Z purchases used ferrous and non-ferrous scrap metal from the general public, dealers and vendors. It generates revenue by sorting, processing and consolidating metals for resale to domestic and international recycled metals customers, or by acting as a broker in a purchase and sale transaction. Pricing reflects the current commodities market for each particular metal and terms range from cash-in-advance to typical 30 day terms, sometimes backed by letters of credit. Currently, A to Z generates approximately 50% of its revenue by reselling metal acquired from the general public via its "dock" operations ("Dock Operations"), in which members of the public exchange scrap metal at A to Z's dock for cash. The Dock Operations are a critical way in which A to Z acquires inventory. As A to Z has operated over the past year, approximately $50,000 in cash is required on a daily basis to sustain the Dock Operations.

DECLARATION OF SAM LEE

{7704.005-636653.DOC-(1)}

5.       Approximately 40% of A to Z's revenue is generated by reselling metal acquired through its dealer transactions, whereby dealers sell and physically ship inventory to A to Z. A to Z's remaining revenue (approximately 10% of total revenue) is generated through various brokered transactions. In these transactions, A to Z does not physically take possession of the metal – rather, it finds a willing seller and a willing buyer, and then typically arranges for shipment of the metal from seller to buyer.

6.       Based on my review of the internally prepared financial statements as of December 31, 2009, A to Z had accounts receivable of $1,517,335; inventory of $3,230,305; property and equipment of $9,396,159; and other assets of $322,278. Thus, total assets of A to Z as of December 31, 2009 equaled $11,353,815. The calculation of total assets assumes: (i) $125,503 of the accounts receivable is bad debt and will not be collected; (ii) the property and equipment has accumulated depreciation of $2,940,019; and (iii) has negative cash in the amount of $46,740. As of the date of the Petition Date, A to Z had accounts payable totaling $2,901,163.52. Prior to the filing of the Involuntary Petition by Hanmi, A to Z issued a number of checks (totaling $466,285.87) which were not cashed as of the Petition Date (collectively, the "Outstanding Checks"). As a result of the administrative freeze placed on A to Z's accounts, none of the Outstanding Checks can currently be negotiated. The $2,901,163.52 number does not include the amount of the Outstanding Checks.

7.       SLE Metal Inc., a California corporation ("SLE"), is an affiliate of A to Z with two (2) shareholders. I own a 66.66% interest in SLE, while Hwang owns a 33.34% interest in SLE. On or about June 25, 2009, SLE filed a voluntary chapter 7 case in the United States Bankruptcy Court for the Central District of California, Case No. 09-bk-16252-RK.

8.       Another affiliate of A to Z is Unlimited Metals, Inc., a California corporation ("UMI"). UMI's operations are located in the downtown Los Angeles area. Gomes and I each own a 40% interest in UMI, while Hwang owns a 20% interest. UMI acquires metals solely from the general public through its own dock operations. Approximately 90% of UMI's inventory is sold to A to Z at a discounted price. UMI's inventory is included in the borrowing base calculation made pursuant to the Forbearance Agreement.

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

{7704.005-636653.DOC-(1)}

-19-

9.      Based on my review of the various loan documents, an various dates beginning on or about December, 2004, U.S. Bank provided the following loans to A to Z (collectively, the "USB Loans"):

a. Pursuant to a Term Loan Agreement dated as of December 16, 2004 (as amended from time to time, "Term Loan Agreement A") by and between A to Z and U.S. Bank, U.S. Bank made a loan to A to Z. The loan is evidenced by, among other things, that certain Term Note dated December 16, 2004 made payable to U.S. Bank in the stated principal amount of $875,000 and issued pursuant to Term Loan Agreement A (as such note has been amended from time to time, "Term Note A"). Term Loan Agreement A and Term Note A were amended by that certain Amendment to Loan Agreement and Note dated as of May 22, 2007.

b.      Pursuant to a Term Loan Agreement dated as of August 30, 2005 (as amended from time to time, "Term Loan Agreement B") by and between A to Z and U.S. Bank, U.S. Bank made a loan to A to Z. The loan is evidenced by, among other things, that certain Term Note dated August 30, 2005 made payable to U.S. Bank in the stated principal amount of $500,000 and issued pursuant to Term Loan Agreement B (as such note has been amended from time to time, "Term Note B"). Term Loan Agreement B and Term Note B were amended by that certain Amendment to Loan Agreement and Note dated as of May 22, 2007.

c.      Pursuant to an Amended and Restated Credit Agreement dated as of October 16, 2006 (as amended from time to time, "Credit Agreement"; and together with Term Loan Agreement A and Term Loan Agreement B, collectively, the "A to Z Loan Agreements"), U.S. Bank agreed to make certain loans to A to Z. The Credit Agreement was amended by those certain amendments dated as of March 28, 2007; May 29, 2007; September 19, 2007; December 12, 2007; December 28, 2007; February 27, 2008;

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

{7704.005-636653.DOC-(1)}

DECLARATION OF SAM LEE

August 22, 2008; September 23, 2008; and January 13, 2009 (the "Amendments").

d.   The loans made pursuant to the Credit Agreement are evidenced by, among other things, (i) that certain Equipment Refinance Term Note dated December 12, 2007 made payable to U.S. Bank in the stated principal amount of $1,200,000 and issued pursuant to the Credit Agreement (as such note has been amended from time to time, "Term Note C"), (ii) that certain Revolving Credit Note dated January 13, 2009 made payable to U.S. Bank in the stated principal amount of $18,400,000 and issued pursuant to the Credit Agreement (as such note has been amended from time to time, the "Revolving Note"), (iii) that certain Term Note dated December 28, 2007 made payable to U.S. Bank in the stated principal amount of $2,549,998 and issued pursuant to the Credit Agreement (as such note has been amended from time to time, "Term Note D"); and (iv) that certain 2008 Term Note dated September 23, 2008 made payable to U.S. Bank in the stated principal amount of $675,000 and issued pursuant to the Credit Agreement (as such note has been amended from time to time "2008 Term Note").

10.   To secure performance of A to Z's obligations under the A to Z Loan Agreements and the Notes, A to Z made, executed and delivered to U.S. Bank an Amended and Restated Business Security Agreement dated as of October 16, 2006 (the "USB Security Agreement"). The USB Security Agreement grants a security interest (the "USB Security Interest") in the personal property described therein (the "USB Collateral").

11.   The USB Loans were guaranteed by the following guarantors:

a.   UMI guaranteed the USB Loans pursuant to that certain Amended and Restated Corporate Guarantee Agreement dated as of October 16, 2006 in favor of U.S. Bank (the "UMI USB Guarantee"). To secure performance of its obligations under the UMI USB Guarantee, UMI made, executed and

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
LAWYERS

{7704.005-636653.DOC-(1)}

-21-

DECLARATION OF SAM LEE

1    delivered to U.S. Bank a General Business Security Agreement dated as of

2    October 16, 2006 (the "UMI USB Security Agreement").

3    b.    Hwang guaranteed the USB Loans pursuant to that certain Amended and

4    Restated General Guarantee dated as of October 16, 2006 in favor of U.S.

5    Bank (the "Hwang Guarantee").

6    c.    I guaranteed the USB Loans pursuant to that certain Amended and

7    Restated General Guarantee dated as of October 16, 2006 in favor of U.S.

8    Bank (the "Lee Guarantee").

9    d.    Gomes guaranteed the USB Loans pursuant to that certain Amended and

10    Restated General Guarantee dated as of October 16, 2006 in favor of U.S.

11    Bank (the "Gomes Guarantee").  Hwang, Gomes and I may be collectively

12    referred to herein as the "Individual Guarantors".

13    12.    The USB Loans are A to Z's primary source of financing.  As of February 12, 2010

14    US Bank asserts that the outstanding principal amount of the Resolving Note and the Term

15    Notes are $13,148,892.91 and $2,230,030.24, respectively.

16    13.    On July 30, 2009 and August 5, 2009, U.S. Bank notified A to Z by letter of a default

17    under the USB Loan and accelerated all of the obligations owing to U.S. Bank.  At the request of

18    A to Z, U.S. Bank agreed to forbear from exercising its default rights and remedies pursuant to

19    the terms set for in that certain Forbearance Agreement dated as of August 10, 2009 (the

20    "Forbearance Agreement") among A to Z, certain others and U.S. Bank (a copy of which is

21    attached to the Motion as Exhibit "B").  The Forbearance Agreement generally provided for the

22    following:

23    a.    All of A to Z's collections would be deposited into a blocked account at U.S.

24    Bank.

25    b.    U.S. Bank would release funds from the blocked account and permit them

26    to be used by A to Z so long as, among other things, the "overadvance" did

27    not increase from a baseline level, the outstanding amount of the revolving

28    credit note was reduced by $3,000 per day (which U.S. Bank was

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

(7704.005-636653.DOC-(1))

–22–

DECLARATION OF SAM LEE

1     permitted to deduct from the deposit account), and principal and interest

2     payments to U.S. Bank were kept current.

3     c.     If the overadvance increased from the baseline, U.S. Bank could apply

4     funds from the deposit account to reduce the overadvance to the baseline

5     level.

6     11.     On various dates beginning on or about March, 2007, Hanmi made three (3) loans

7 to SLE, as borrower, in the aggregate principal amount of approximately $19,500,000

8 (collectively, the "Hanmi Loans") pursuant to various notes and other documents (collectively,

9 the "Hanmi Loan Documents"). As additional security for some or all of the Hanmi Loans, A to Z

10 guaranteed the Hanmi Loans and granted Hanmi a security interest in some or all of A to Z's

11 personal property ("Hanmi Security Interest"). The Hanmi Security Interest is junior and

12 subordinate to the USB Security Interest.

13     12.     On February 10, 2010 (the "Petition Date"), Hanmi, as sole petitioning creditor,

14 filed an Involuntary Petition against A to Z. A to Z believes Hanmi had reason to know that A to

15 Z has more than 12 creditors.

16     13.     Over the past few years, A to Z's business has slowed due to the difficult economic

17 environment. At all times, A to Z has worked closely with U.S. Bank in an effort to increase the

18 profitability of the company, which inures to the benefit A to Z, U.S. Bank and other creditors of

19 A to Z. To this end, since August, 2009 until the Petition Date, U.S. Bank has continued to

20 release funds for A to Z to use in its business operations.

21     14.     As of the commencement of the Involuntary Case, U.S. Bank has placed an

22 administrative freeze on all of A to Z's accounts at U.S. Bank. Such action has effectively

23 eliminated A to Z's liquidity.

24     15.     A to Z must be able to promptly pay all Necessary Expenses as set forth in the

25 Budget (which was prepared by Terry Shope an outside consultant engaged to assist A to Z in

26 its reorganization efforts), to avoid immediate and irreparable harm. Necessary Expenses

27 include, without limitation, cash required to fund A to Z's Dock Operations, payroll and payment

28 to certain vendors. It is imperative that A to Z obtain immediate funding as critical portions of A

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

{7704.005-636653.DOC-(1)}

–23–

DECLARATION OF SAM LEE

1   to Z's business operations have already ceased due to A to Z's lack of liquidity. Prolonging, even

2   briefly, this period of cessation in A to Z's operations will have devastating consequences for A

3   to Z and severely limit the chances that A to Z can continue to operate as a going concern.

4          16.      The Stipulation, a true and correct copy of which is attached as Exhibit 1 to the

5   Motion (and which incorporates a true and correct copy of the Forbearance Agreement)

6   provides a framework acceptable to A to Z and, because it allows for the continued operation of

7   A to Z, saves jobs and may benefit A to Z's other creditors. By contrast, if A to Z does not

8   continue to operate, A to Z's employees will lose their jobs and the Alleged Debtor's creditors

9   will receive nothing.

10         I declare under penalty of perjury under the laws of the United States of America that the

11  foregoing is true and correct.

12         Executed this 17th day of February, 2010, at Los Angeles, California.

13

14                                              Sam Lee

15

16

17

18

19

20

21

22

23

24

25

26

27

**RUTTER** 28
**HOBBS &**
**DAVIDOFF**
INCORPORATED
L A W Y E R S

DECLARATION OF SAM LEE

{7704.005-636653.DOC-(1)}

# DECLARATION OF DAVID JOE

I, David Joe, declare as follows:

1.      I am an attorney at law duly licensed to practice before this United States Bankruptcy Court.  I am an associate in the law firm of Rutter Hobbs & Davidoff Incorporated ("RHD"), employed as attorneys herein for the Alleged Debtor, Gomes Enterprises, LLC, d/b/a A to Z Metals ("A to Z").  I have personal knowledge of the facts stated herein, and, if called as a witness, I could and would testify competently thereto.

2.      A list purporting to be A to Z's largest creditors ("Creditors") was provided to RHD by A to Z's turnaround consultants, MPL Consulting, Inc.  Notice of the motion to which this Declaration is attached has been served on the twenty largest Creditors by RHD via U.S. Mail.  Once the Court notifies RHD of a time and date for hearing, RHD will notify the twenty largest Creditors via telephone or facsimile of the same.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 17th day of February, 2010, at Los Angeles, California.

David Joe

RUTTER
HOBBS &
DAVIDOFF
INCORPORATED
L A W Y E R S

{7704.005-636786.DOC-(1)}

–25–