EXHIBIT "A"

EXECUTION COPY

## FORBEARANCE AGREEMENT

This Forbearance Agreement ("Agreement") is entered into as of August 10, 2009, by and among GOMES ENTERPRISES, LLC, a California limited liability company ("Borrower"), UNLIMITED METALS, INC., a California corporation ("Unlimited Metals"), DAVID F. GOMES, an individual ("David Gomes"), SAM KUK LEE, an individual ("Sam Lee"), and SEONG (STEVE) JOON HWANG, an individual ("Steve Hwang" and together with Unlimited Metals, David Gomes and Sam Lee, each a "Guarantor" and collectively "Guarantors" and together with Borrower, collectively the "Loan Parties") and U.S. BANK NATIONAL ASSOCIATION ("Bank"), with reference to the following facts:

### RECITALS

A.    Pursuant to a Term Loan Agreement dated as of December 16, 2004 (as amended from time to time, "Term Loan Agreement A") by and between Borrower and Bank, Bank made a loan to Borrower. The loan is evidenced by, among other things, that certain Term Note dated December 16, 2004 made payable to Bank in the stated principal amount of $875,000 and issued pursuant to Term Loan Agreement A (as such note has been amended from time to time, "Term Note A"). Term Loan Agreement A and Term Note A were amended by that certain Amendment to Loan Agreement and Note dated as of May 22, 2007.

B.    Pursuant to a Term Loan Agreement dated as of August 30, 2005 (as amended from time to time, "Term Loan Agreement B") by and between Borrower and Bank, Bank made a loan to Borrower. The loan is evidenced by, among other things, that certain Term Note dated August 30, 2005 made payable to Bank in the stated principal amount of $500,000 and issued pursuant to Term Loan Agreement B (as such note has been amended from time to time, "Term Note B"). Term Loan Agreement B and Term Note B were amended by that certain Amendment to Loan Agreement and Note dated as of May 22, 2007.

C.    Pursuant to an Amended and Restated Credit Agreement dated as of October 16, 2006 (as amended from time to time, "Credit Agreement"; and together with Term Loan Agreement A and Term Loan Agreement B, collectively, the "Gomes Loan Agreements"), Bank agreed to make certain loans to Borrower. The Credit Agreement was amended by those certain amendments dated as of March 28, 2007; May 29, 2007; September 19, 2007; December 12, 2007; December 28, 2007; February 27, 2008; August 22, 2008; September 23, 2008; and January 13, 2009 (the "Amendments").

D.    The loans made pursuant to the Credit Agreement are evidenced by, among other things, (i) that certain Equipment Refinance Term Note dated December 12, 2007 made payable to Bank in the stated principal amount of $1,200,000 and issued pursuant to the Credit Agreement (as such note has been amended from time to time, "Term Note C"), (ii) that certain Revolving Credit Note dated January 13, 2009 made payable to Bank in the stated principal amount of $18,400,000 and issued pursuant to the Credit Agreement (as such note has been amended from time to time, the "Revolving Note"), (iii) that certain Term Note dated December 28, 2007 made payable to Bank in the stated principal amount of $2,549,998 and issued pursuant to the Credit Agreement (as such note has been amended from time to time, "Term Note D"); and (iv) that certain 2008 Term Note dated September 23, 2008 made payable to Bank in the stated principal amount of $675,000 and issued pursuant to the Credit Agreement (as such note has been amended from time to time "2008 Term Note").

E.    Term Note A, Term Note B, Term Note C, Term Note D, the Revolving Note and the 2008 Term Note are hereinafter collectively referred to as the "Notes".

F.    To secure performance of its obligations under the Gomes Loan Agreements and Notes, Borrower made, executed and delivered to Bank an Amended and Restated Business Security Agreement dated as of October 16, 2006 (the "Security Agreement").  The Security Agreement grants a security interest in the personal property described therein (the "Gomes Collateral").

G.    Bank properly perfected its security interest as described in the Security Agreement by, among other things, filing a Uniform Commercial Code financing statement with the California Secretary of State on December 15, 2003 as document no. 03-35360858 (as amended and continued from time to time, the "Financing Statement").

H.    To further induce Bank to make the above-referenced loans (the "Loans"), the Loans were guaranteed by the Guarantors.

I.    Unlimited Metals guaranteed the Loans pursuant to that certain Amended and Restated Corporate Guarantee Agreement dated as of October 16, 2006 by Unlimited Metals in favor of Bank (the "Corporate Guarantee").

J.    To secure performance of its obligations under the Corporate Guarantee, Unlimited Metals made, executed and delivered to Bank a General Business Security Agreement dated as of October 16, 2006 (the "Unlimited Metals Security Agreement").  The Unlimited Metals Security Agreement grants a security interest in the personal property described therein (the "Unlimited Metals Collateral" and together with the Gomes Collateral, the "Collateral").

K.    Bank properly perfected its security interest as described in the Unlimited Metals Security Agreement by, among other things, filing a Uniform Commercial Code financing statement with the California Secretary of State on December 15, 2003 as document no. 03-35360873 (as amended or continued from time to time, the "Unlimited Metals Financing Statement").

L.    To further induce Bank to make the Loans, Steve Hwang executed an Amended and Restated General Guarantee dated as of October 16, 2006 in Bank's favor (the "Hwang Guarantee"); Sam Lee executed an Amended and Restated General Guarantee dated as of October 16, 2006 in Bank's favor (the "Lee Guarantee"); and David Gomes executed an Amended and Restated General Guarantee dated as of October 16, 2006 in Bank's favor (the "David Gomes Guarantee")  Steve Hwang, Sam Lee and David Gomes are sometimes collectively referred to herein as, the "Individual Guarantors.".

M.    The David Gomes Guarantee, Lee Guarantee and Hwang Guarantee are collectively referred to as the "Individual Guarantees", and together with the Corporate Guarantee, are referred to as the "Guarantees".

N.    The Gomes Loan Agreements, Notes, Security Agreement, Financing Statement, Guarantees, Unlimited Metals Security Agreement, Unlimited Metals Financing Statement and any other documents executed in connection therewith are referred to herein as the "Loan Documents".

O.    For purposes hereof, the term "Obligations" shall mean the Loans, and all other loans, advances, debts, liabilities and obligations, tasks or duties for the performance of covenants or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to Bank, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under the Gomes Loan Agreements or any of the other Loan Documents (as defined herein).  The term Obligation includes but is not limited to all principal, interest (including all interest which accrues after the commencement of any case or proceeding in bankruptcy,

whether or not allowed in such case or proceeding), fees, charges, expenses, attorneys' fees and any other sum chargeable to Borrower under the Gomes Loan Agreements or any of the other Loan Documents.

P.    Events of Default under the Gomes Loan Agreements exist because (i) Borrower has failed to repay that portion of the outstanding principal amount of the Revolving Note which has been and remains in excess of the Borrowing Base limitation as set forth in the Credit Agreement (such excess outstanding principal amount is hereinafter referred to as the "Overadvance") and (ii) Borrower has failed to repay the Revolving Note in full and in connection with immediately available funds on or before the Revolving Credit Termination Date, April 5, 2009 (collectively, the "Payment Defaults"). As a result of the Payment Defaults, additional Events of Default have occurred under each of the Gomes Loan Agreements, the other Notes and the other Loan Documents pursuant to cross-default provisions to other defaulted obligations of Borrower to Bank with respect to indebtedness for money owed (the "Cross Defaults" and together with the Payment Defaults, collectively, the "Designated Defaults"). In addition, as a result of the Payment Defaults, Bank has no obligation to make advances under the Loan Documents or to otherwise extend credit to Borrower and has the right to exercise its rights and remedies under the Loan Documents and under applicable law.

Q.    On July 30, 2009 and August 5, 2009, Bank notified Borrower and Guarantors by letters (collectively, the "Default Letters") of the Designated Defaults and accelerated all of the Obligations owing to Bank that have not already become due according to their terms. Pursuant to the Default Letters, Bank made formal demand on Borrower and the Guarantors for immediate repayment in full of all amounts due under and in connection with the Loans by no later than August 6, 2009. The amounts due and owing under the Loan Documents as of July 30, 2009 were $17,219,772.41, representing $17,171,874.86 in principal and $47,897.55 in interest, together with all interest accrued after that date and all costs, fees or expenses (including, without limitation attorneys' fees and expenses) incurred by Bank in connection with the Loans.

R.    By the Default Letters, Bank also notified Borrower and the Guarantors that it has elected to charge interest at the default interest rates as set forth in the various Gomes Loan Agreements until all amounts outstanding under the Loan Documents have been repaid in full.

S.    At the close of business on August 6, 2009, Borrower and the Guarantors had failed to repay the Obligations in full to Bank, and the Obligations remain due and payable. Bank agreed to toll, in certain respects, the operation of the Default Letters to the close of business on August 10, 2009.

T.    The Loan Parties request that Bank forbear from exercising its default rights or remedies in response to the Designated Defaults. The Loan Parties have assured Bank that its position will not deteriorate during the Forbearance Period (defined below), and that the Loan Parties shall perform in accordance with this Agreement. Although Bank is under no obligation to do so, Bank is willing to forbear from exercising its default rights against the Loan Parties for the period set forth herein on the terms and conditions set forth in this Agreement.

## AGREEMENT

**NOW THEREFORE,** in consideration of the foregoing and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Defined Terms**. Capitalized terms used but not defined herein shall have the meanings given to them in the Gomes Loan Agreements. This Agreement shall constitute a "Loan Document" under and as defined in the Gomes Loan Agreements. Any reference to a "person" in this Agreement shall mean either a natural person or any type of entity, as applicable.

2.      **Incorporation of Recitals.**  Each of the above recitals is incorporated herein as true and correct and is relied upon by Bank in agreeing to the terms of this Agreement.

3.      **Forbearance.**  Subject to the terms and conditions of this Agreement, until the earlier of (i) August 21, 2009, or (ii) the date of the occurrence of any Forbearance Default (defined below), or any condition, act or event which with the giving of notice or the passage of time or both would constitute a Forbearance Default (the period from the date of this Agreement to the earlier to occur of the foregoing clauses (i) and (ii) being referred to herein as the "Forbearance Period"), Bank will forbear from exercising its rights and remedies against the Loan Parties under the Loan Documents.  The Loan Parties hereby acknowledge and agree that the forbearance provided herein shall:  (i) not constitute a cure of the Designated Defaults under the Loan Documents; and (ii) be without prejudice to or waiver of any rights and/or remedies that Bank has due to the Designated Defaults or any other defaults.

4.      **Default Interest Rate.**  Loan Parties acknowledge and agree that during the Forbearance Period interest shall continue to accrue on all Obligations at the Default Rate applicable to each Gomes Loan Agreement or Note, as applicable.

5.      **Enforceability Obligations, Collateral Agreements and other Loan Documents.**  The Loan Parties acknowledge and agree that:

      a.      The outstanding balance of principal owing to Bank with respect to Term Note A is at least $258,323.74 as of August 10, 2009, plus accrued interest, late fees, other fees, attorneys' fees and other expenses; and Loan Parties are jointly and severally liable for payment of such amounts.

      b.      The outstanding balance of principal owing to Bank with respect to Term Note B is at least $200,012.00 as of August 10, 2009, plus accrued interest, late fees, other fees, attorneys' fees and other expenses; and Loan Parties are jointly and severally liable for payment of such amounts.

      c.      The outstanding balance of principal owing to Bank with respect to Term Note C is at least $800,000.00 as of August 10, 2009, plus accrued interest, late fees, other fees, attorneys' fees and other expenses; and Loan Parties are jointly and severally liable for payment of such amounts.

      d.      The outstanding balance of principal owing to Bank with respect to Term Note D is at least $1,204,165.96 as of August 10, 2009, plus accrued interest, late fees, other fees, attorneys' fees and other expenses; and Loan Parties are jointly and severally liable for payment of such amounts.

      e.      The outstanding balance of principal owing to Bank with respect to the 2008 Term Note is at least $506,250.00 as of August 10, 2009, plus accrued interest, late fees, other fees, attorneys' fees and other expenses; and Loan Parties are jointly and severally liable for payment of such amounts.

      f.      The outstanding balance of principal owing to Bank with respect to the Revolving Note is at least $14,160,968.46 as of August 10, 2009, plus accrued interest, late fees, other fees, attorneys' fees and other expenses; and Loan Parties are jointly and severally liable for payment of such amounts.

g.   Bank has a valid, perfected, and first priority security interest and lien (i) upon the Gomes Collateral to secure the Obligations and (ii) upon the Unlimited Metals Collateral to secure the obligations of Unlimited Metals under its Corporate Guarantee.

h.   Each of the Loan Documents is in full force and effect, and is enforceable against the respective parties thereto in accordance with its terms.

i.   Each of the Loan Parties ratifies and reaffirms all of its obligations under the Loan Documents to which it is a party, and consents to the terms, conditions and provisions of this Agreement.

j.   Each of the Loan Parties has no defenses, offsets, recoupments or counterclaims to (i) its obligation to pay all amounts from time to time owing and to perform all obligations required to be performed under the Loan Documents to which it is a party, (ii) enforcement of Bank's rights in and to the Collateral, or (iii) enforcement of any other of Bank's rights or remedies under the Loan Documents or applicable law.

6.   **Representations and Warranties.** The Loan Parties represent and warrant to Bank as follows:

a.   Other than the Designated Defaults, there exists no default or Event of Default, or any other condition that with the passage of time or the giving of notice or both would constitute a default or Event of Default, under any Loan Document.

b.   Each person executing and delivering this Agreement (or any other document contemplated herein) to Bank on behalf of a corporation or limited liability company, has all necessary authority to enter into such documents on behalf of such entity.

c.   All representations and warranties contained in the Loan Documents are and remain true and correct as of the date of this Agreement except with respect to the Designated Defaults.

7.   **Conditions Precedent.** This Agreement shall not be effective and Bank shall have no obligation to forbear from exercising any rights or remedies unless and until each of the following conditions precedent has been satisfied not later than August 12, 2009, or waived in writing by Bank (in Bank's sole discretion):

a.   Each of the Loan Parties shall have executed and delivered to Bank this Agreement (together with all exhibits attached hereto, each in form and substance satisfactory to Bank and its counsel in their reasonable discretion);

b.   Officers of each of the Loan Parties shall have executed and delivered such certificates evidencing the authority of Loan Parties to enter into this Agreement as Bank may require in its sole and absolute discretion; and

c.   Bank shall have received any other agreements, entity documents, UCC and litigation searches, and information relating to the Loans that Bank may reasonably require or request in connection with this Agreement or in accordance with the other Loan Documents.

8.   **Advances.** During the Forbearance Period and at all times thereafter, Bank shall have no obligation to make any advances under the Revolving Note or any other Loan Document.

9.    **Restricted Payments; Subordination**. Neither Borrower nor Unlimited Metals shall declare or make, or incur any liability to make, any Restricted Payments to any person, including the principals of each of Borrower and Unlimited Metals. Additionally, neither Borrower nor Unlimited Metals shall make any payment of any nature to any Individual Guarantor. For purposes hereof, the term "Restricted Payment" means:

      a.      any dividend or other distribution on any shares of capital stock (of any class or series of Borrower or Unlimited Metals, as the case may be, and any redemption or acquisition by Borrower or Unlimited Metals, as the case may be, of any capital stock of such entity); and

      b.      any payment, repayment, redemption, retirement, repurchase or other acquisition, direct or indirect, by Borrower or Unlimited Metals, as the case may be, of, on account of, or in respect of, the principal of any subordinated debt (or any installment thereof) prior to the regularly scheduled maturity date thereof (as in effect on the date such subordinated debt was originally incurred).

In addition, each Individual Guarantor subordinates all indebtedness now or at any time hereafter owing from Borrower or Unlimited Metals to such Individual Guarantor ("Junior Debt") to all indebtedness now or at any time hereafter owing from Borrower or Unlimited Metals to Bank ("Senior Debt"). Each Individual Guarantor irrevocably consents and directs that all Senior Debt shall be paid in full in cash or other immediately available funds prior to Borrower or Unlimited Metals making any payment on any Junior Debt. Each Individual Guarantor will not take any action or initiate any proceedings, judicial or otherwise, to enforce his rights or remedies with respect to any Junior Debt, including without limitation, any action to enforce remedies with respect to any collateral securing any Junior Debt or to obtain any judgment or prejudgment remedy against Borrower or Unlimited Metals or any such collateral. Each Individual Guarantor agrees, upon the request of Bank, to execute subordination agreements, in form and substance satisfactory to Bank in its reasonable discretion.

10.    **Payments during Forbearance Period**. *As a condition to Bank's obligation to forbear as provided herein, Borrower shall, throughout the Forbearance Period, keep any scheduled interest payments (at the Default Rate) and principal payments current under the Loan Documents (except for repayment of the principal balance of the Revolving Note or paydown of the Overadvance). Nothing herein shall be deemed a modification of any of the maturity dates of the Notes or a waiver of any Designated Default or of the acceleration of the Obligations. Notwithstanding the payment provisions set forth in this Agreement and Bank's acceptance of the same during the Forbearance Period, all Obligations shall be (and remain) due and payable in full on the termination of the Forbearance Period.*

11.    **Collateral Accounts; Other Deposit Accounts**. Borrower and Unlimited Metals shall have opened accounts with and controlled by Bank with account numbers 1534-9551-8950 and 1534-9551-9263, respectively ("Collateral Accounts"), for the collection of any and all amounts, payments, fees, reimbursements of expenses, discounts or credits to Borrower or Unlimited Metals, as the case may be, income, interest and other monies directly or indirectly received by or on behalf of or credited to Borrower or Unlimited Metals, as the case may be, from any person with respect to Borrower's or Unlimited Metals', as the case may be, ownership of the Collateral and any and all other collections of any type or nature. If, notwithstanding this requirement, Borrower or Unlimited Metals makes any deposit of or in respect of Collateral (or any other monies received) into any other account at Bank, Borrower and Unlimited Metals each authorize Bank to immediately sweep such funds to the respective Collateral Account. Bank also has swept or may sweep funds that were in other accounts of Borrower and Unlimited Metals at Bank prior to this Agreement to the respective Collateral Account, to which Borrower and Unlimited Metals consent. Other than as permitted herein, neither Borrower nor Unlimited

Metals shall have any right to make withdraws from or write checks against or otherwise access funds in the Collateral Accounts. The Collateral Accounts shall be governed by the Bank's agreement "Your Deposit Account Agreement and General Terms and Conditions" effective March 15, 2007 and all amendments thereto and replacements thereof from time to time, and in addition to the terms set forth therein, Borrower and Unlimited Metals shall pay all servicing and account fees applicable to the Collateral Accounts. Neither Borrower nor Unlimited Metals shall maintain and deposit funds at any financial institution other than Bank; provided; however, that Borrower may maintain a payroll account at Saehan Bank (the "Payroll Account") Notwithstanding anything herein to the contrary, Borrower may maintain and deposit funds into the Payroll Account in an aggregate amount not to exceed payroll obligations and any related payment burdens that have accrued, or that are accruing for the current payroll period. Borrower shall immediately provide Bank, upon Bank's oral or written request, with an accounting of such payroll obligations and bank statements with respect to the Payroll Account.

12.     **Collateral Reviews**. Bank shall have the right to conduct collateral audits and collateral reviews with respect to the Collateral in its discretion and at Loan Parties' cost as frequently as Bank determines is necessary or appropriate in its discretion.

13.     **Budget**. Borrower has provided a two week cash flow projection for its operations and Unlimited Metals' operations throughout the Forbearance Period, a true and correct copy of which is attached as Exhibit A hereto and which is incorporated herein by this reference (as the same may be amended from time to time by Borrower if accepted by Bank, in its sole and absolute discretion, collectively, the "Approved Budget"). The Approved Budget specifies, on a daily basis, by amount, type and kind, all revenues and expenses anticipated by Borrower and Unlimited Metals for the Forbearance Period. On each day during the Forbearance Period, Borrower shall submit to Bank in writing: (a) a statement of revenues and expenses (in the same detail as set forth in the Approved Budget) (i) for the prior day and a comparison of such statement to the applicable day in the Approved Budget, and (ii) for the cumulative period from the commencement of the Forbearance Period through such prior day and a comparison thereof to the corresponding period in the Approved Budget, and (b) a reconciliation showing any adjustments made to the daily and cumulative reports described above.

14.     **Approved Budget Variances**. As used herein, "Collection Variance" means, for any day or period, the aggregate of the budgeted amounts for the categories in the Approved Budget that are totaled and referred to therein as "Total Cash to Be Received" (exclusive of the line item entitled "Cash on Hold at U.S. Bank") minus the aggregate of the actual results for such categories as shown in the Approved Budget, divided by the aggregated of the amounts for such categories as shown in the Approved Budget, expressed as a percentage; and "Disbursement Variance" means, for any day or period, the aggregate of the actual results for the categories in the Approved Budget that are totaled and referred to therein as "Total Cash to Be Paid For Operations" and "Net Cash Used in Financing Activities" minus the aggregate of the budgeted amounts for such categories as shown in the Approved Budget, divided by the aggregate of the amounts for such categories as shown in the Approved Budget, expressed as a percentage. The occurrence of any of the following shall constitute a Forbearance Default:

     a.     If the Collection Variance, measured on a cumulative basis commencing on August 10, 2009, is greater than ten percent (10%) as of any day during the Forbearance Period;

b.     If the Disbursement Variance, measured on a cumulative basis commencing on August 10, 2009, is greater than ten percent (10%) as of any day during the Forbearance Period;

c.     If the sum of the Collection Variance and the Disbursement Variance (i.e., the sum of those two percentages), each measured on a cumulative basis commencing on August 10, 2009, is greater than ten percent (10%) as of any day during the Forbearance Period; or

d.     If the actual results for any line item (other than payments of amounts owing on the Loans) exceeds the budgeted amount for such item set forth in the Approved Budget by more than 15% on a cumulative basis commencing on August 10, 2009 through any day during the Forbearance Period.

15.    **Release of Funds in Collateral Accounts.**

a.     On August 12, 2009, Bank shall transfer an amount requested by Borrower up to $409,417 from the Collateral Account of Borrower to its general account maintained at Bank.

b.     In addition to the one-time amount referenced in clause 15(a) above, on August 12, 2009 and on each day thereafter during the Forbearance Period, Borrower and Unlimited Metals shall be allowed to withdraw Collected Funds from the respective Collateral Accounts on such day for such uses shown on the Approved Budget(cumulatively commencing from August 10, 2009 through such day) ; provided that the following conditions are satisfied on each such day:

    (i)     a daily Consolidated Borrowing Base Certificate as of the close of business for the previous day, in form and substance satisfactory to Bank, has been delivered by Borrower;

    (ii)    the Consolidated Borrowing Base shall have not declined from the Consolidated Baseline Borrowing Base (less any amounts by which the outstanding principal amount of the Revolving Note has been reduced pursuant to clause 15(d) below), as evidenced by such Consolidated Borrowing Base Certificate and such Consolidated Baseline Borrowing Base Certificate, as the case may be;

    (iii)   the Approved Budget is within the variances set forth in Section 14, above; and

    (iv)   there is no Forbearance Default under this Agreement.

c.     If on any day on or after August 12, 2009 during the Forbearance Period, the Consolidated Overadvance under the Consolidated Borrowing Base has increased from the Consolidated Overadvance under the Consolidated Baseline Borrowing Base, Borrower and Unlimited Metals shall only be allowed to withdraw Collected Funds from the respective Collateral Accounts if all conditions in clause 15(b) above (except for clause 15(b)(ii)) have been satisfied; provided, that, the amount of Collected Funds available for the Borrower and Unlimited Metals to withdraw from the Collateral Accounts shall not exceed the aggregate amount of Collected Funds which remain in the Collateral Accounts (if any) after giving effect to any application of funds in the

Collateral Accounts to the outstanding principal amount of the Revolving Note pursuant to clause 15(d) below.

d.     If, on any day, the Consolidated Overadvance set forth in the current Consolidated Borrowing Base Certificate exceeds the Consolidated Overadvance set forth in the Consolidated Baseline Borrowing Base Certificate (the amount of such excess being referred to herein as an "Excess"), Bank may immediately apply funds from the Collateral Accounts to reduce the outstanding principal amount of the Revolving Note by the amount of the Excess. Any amounts applied in reduction of the principal amount of the Revolving Note may not be reborrowed.

e.     Following the occurrence of a Forbearance Default under this Agreement, neither Borrower nor Unlimited Metals shall have access to or any ability to withdraw any further funds from the Collateral Accounts.

For purposes of this Section 15, the following terms are defined as follows:

"Collected Funds" means amounts deposited or transferred to the Collateral Accounts for which the corresponding item deposited into the respective Collateral Account (or deposited into another account and transferred to the respective Collateral Account) have been finally paid to Bank in good funds with no further ability of such item to be returned or of such funds being required to be returned.

"Consolidated Baseline Borrowing Base" means, as of August 7, 2009, the Borrowing Base (as generally defined in the Credit Agreement) but determined as to both the Borrower and Unlimited Metals on a consolidated basis in accordance with generally accepted accounting principles.

"Consolidated Baseline Borrowing Base Certificate" means a certificate evidencing the Consolidated Baseline Borrowing Base as set forth on Exhibit B attached hereto and by this reference incorporated herein, signed and certified by Elizabeth Inacay and one or more of Steve Hwang, Sam Lee or David Gomes.

"Consolidated Borrowing Base" means, on any day, the Borrowing Base (as generally defined in the Credit Agreement) but determined as to both the Borrower and Unlimited Metals on a consolidated basis in accordance with generally accepted accounting principles.

"Consolidated Borrowing Base Certificate" means a certificate evidencing the Consolidated Borrowing Base, in form and substance satisfactory to Bank, signed and certified by Elizabeth Inacay and one or more of Steve Hwang, Sam Lee or David Gomes.

"Consolidated Overadvance" means the outstanding principal amount under the Revolving Note that exceeds the Borrowing Base limitation as set forth in the Credit Agreement; provided, that, for purposes of this definition the Borrowing Base limitation shall be calculated using the Consolidated Borrowing Base (as defined herein). For purpose of clarification, any such excess shall be a positive number for the purpose of this definition, even though it may be shown as a negative number in the Consolidated Baseline Borrowing Base Certificate or the Consolidated Borrowing Base Certificate.

For the purpose of computing the Consolidated Borrowing Base and the Consolidated Baseline Borrowing Base and the preparation of the Consolidated Borrowing Base Certificate and the Consolidated Baseline Borrowing Base Certificate, cost of goods sold shall be estimated for each

day during any week using the methodology described in Exhibit C, attached hereto and by this reference incorporated herein, with the cost of goods sold being converted to actual on a weekly basis on each Friday.

16.    **Restructuring Proposal.** By no later than August 14, 2009, Borrower shall deliver to Bank a written proposal of restructuring of the Loans; provided, that the Loan Parties acknowledge and agree that the Bank has made no commitment to restructure the Loans on any particular terms or on any terms at all, and the Bank's willingness to receive such a proposal does not signal any such commitment to restructure the Loans on the part of Bank. Any such commitment on the part of Bank to restructure the Loans shall require necessary credit committee approval and must be in writing and signed by Bank.

17.    **Forbearance Defaults.** Upon the occurrence of any of the following (each a "Forbearance Default") at Bank's option, the Forbearance Period shall immediately terminate without demand, presentment or notice, all of which requirements Loan Parties hereby waive:

        a.        Breach by any Loan Party of any of any of its respective covenants, agreements or other obligations set forth in this Agreement.

        b.        Failure to perform any obligations set forth in, or any other default under, any of the Loan Documents (as the same may be modified by this Agreement) other than the Designated Defaults specified in the recitals to this Agreement as of the specific dates identified therein.

        c.        Any representation or warranty of any Loan Party herein or in any other Loan Document shall be false, misleading or incorrect in any respect.

        d.        The Consolidated Baseline Borrowing Base Certificate, or any other Consolidated Borrowing Base Certificate, or any reporting under Section 14 hereof, is false, misleading or incorrect in any respect.

        e.        Failure to keep interest or principal current as provided in Section 10, above.

        f.        After giving effect to the application of any funds from the Collateral Accounts in reduction of the outstanding principal amount of the Revolving Note pursuant to Section 15(d) hereof, the Consolidated Overadvance set forth in any daily Consolidated Borrowing Base Certificate exceeds the Consolidated Overadvance set forth in the Consolidated Baseline Borrowing Base Certificate.

18.    **Remedies.** Upon the occurrence of a Forbearance Default or the expiration of the Forbearance Period for any other reason, Bank shall be entitled to, among other things: (i) exercise all rights and remedies available to Bank as a creditor generally, including, without limitation, all remedies available to Bank under the Loan Documents, as well as any other rights and remedies available to Bank at law or in equity, and (ii) seek the immediate, ex parte, appointment of a receiver for any Loan Party or any Collateral, to which each Loan Party hereby stipulates and agrees to stipulate. All such rights and remedies shall be cumulative. No failure or delay on the part of Bank in exercising any power, right or remedy under any of the Loan Documents shall operate as a waiver thereof, and no single or partial exercise of any such power, right or remedy shall preclude any further exercise thereof or the exercise of any other power, right or remedy.

19.    **Defaults under Loan Documents.** The occurrence of a Forbearance Default or the expiration of the Forbearance Period for any other reason shall constitute a default or Event of Default under each of the other *Loan Documents.*

20.    **Release.** Each of the Loan Parties (each a "Releasing Party" and collectively, the "Releasing Parties"), releases, acquits and forever discharges Bank and its past and present directors, officers, employees, agents, attorneys, affiliates, successors, administrators and assigns ("Released Parties") of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, expenses and compensation whatsoever heretofore or hereafter arising from any events or occurrences, or anything done, omitted to be done, or allowed to be done by any of the Released Parties, on or before the date of execution of this Agreement, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, including, without limitation, any of the same arising from or related to anything done, omitted to be done, or allowed to be done by any of the Released Parties and in any way related to this Agreement, any of the Loan Documents, any other credit facilities provided or not provided, any advances made or not made, or any past or present deposit or other accounts (including, without limitation, "dominion of funds" accounts and lockbox arrangements) of any Releasing Party with Bank and the handling of the same by the Bank, including, without limitation, the manner and timing in which items were deposited or credited thereto or funds transferred therefrom or made available to any of the Releasing Parties, the honoring or returning of any checks drawn on any account, and any other dealings between the Releasing Parties and the Released Parties; provided, however, that Releasing Parties shall retain their rights to funds in deposit accounts held at Bank, subject to Bank's security interests therein and any right of offset or recoupment with respect thereto (the "Released Matters"). Releasing Parties each further agrees never to commence, aid or participate in (except to the extent required by order or legal process issued by a court or governmental agency of competent jurisdiction) any legal action or other proceeding based in whole or in part upon the Released Matters. In furtherance of this general release, Releasing Parties each acknowledges and waives the benefits of California Civil Code Section 1542 (and all similar ordinances and statutory, regulatory, or judicially created laws or rules of any other jurisdiction), which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Releasing Parties each agree that this waiver and release is an essential and material term of this Agreement and that the agreements in this paragraph are intended to be in full satisfaction of any alleged injuries or damages to or of any Releasing Parties in connection with the Released Matters. Releasing Parties each represent and warrant that it has not purported to convey, transfer or assign any right, title or interest in any Released Matter to any other person or entity and that the foregoing constitutes a full and complete release of the Released Matters. Releasing Parties each also understands that this release shall apply to all unknown or unanticipated results of the transactions and occurrences described above, as well as those known and anticipated. Releasing Parties each has consulted with legal counsel prior to signing this release, or had an opportunity to obtain such counsel and knowingly chose not to do so, and executes such release voluntarily, with the intention of fully and finally extinguishing all Released Matters.

21.    **Waivers.** In addition to any waivers set forth in the other Loan Documents, each Loan Party agrees as follows:

        a.    Each Loan Party agrees that it is jointly and severally, directly, and primarily liable to Bank for payment in full of the Obligations, and that such liability is independent of the duties, obligations and liabilities of each Loan Party.

b.    Each Loan Party consents and agrees that Bank may, at any time and from time to time, without notice or demand, whether before or after any actual or purported termination, repudiation, or revocation of the Gomes Loan Agreements and the other Loan Documents by any one or more Loan Parties, and without affecting the enforceability or continuing effectiveness hereof as to each Loan Party: (a) supplement, restate, modify, amend, increase, decrease, extend, renew, accelerate, or otherwise change the time for payment or the terms of the Obligations or any part thereof, including any increase or decrease of the rate(s) of interest thereon as provided by the Loan Documents (as the same may be amended or restated from time to time); (b) supplement, restate, modify, amend, increase, decrease or waive, or enter into or give any agreement, approval, or consent with respect to, the Obligations or any part thereof, or any of the Loan Documents or any additional security or guaranties, or any condition, covenant, default, remedy, right, representation or term thereof or thereunder; (c) accept new or additional instruments, documents or agreements in exchange for or relative to any of the Loan Documents or the Obligations or any part thereof; (d) accept partial payments on the Obligations; (e) receive and hold additional security or guaranties for the Obligations or any part thereof; (f) release, reconvey, terminate, waive, abandon, fail to perfect, subordinate, exchange, substitute, transfer, or enforce any security or guaranties, and apply any security and direct the order or manner of sale thereof as Bank in its sole and absolute discretion may determine; (g) release any person from any personal liability with respect to the Obligations or any part thereof; (h) settle, release on terms satisfactory to Bank or by operation of applicable laws, or otherwise liquidate or enforce any Obligations and any security therefor or guaranty thereof in any manner, consent to the transfer of any security and bid and purchase at any sale; or (i) consent to the merger, change, or any other restructuring or termination of the corporate or partnership existence of any Loan Party or any other person, and correspondingly restructure the Obligations, and any such merger, change, restructuring, or termination shall not affect the liability of any Loan Party or the continuing effectiveness hereof, or the enforceability hereof with respect to all or any part of the Obligations.

c.    Bank may enforce the Gomes Loan Agreements and the other Loan Documents independently as to each Loan Party and independently of any other remedy or security Bank at any time may have or hold in connection with the Obligations, and it shall not be necessary for Bank to marshal assets in favor of any Loan Party or any other person or to proceed upon or against or exhaust any security or remedy before proceeding to enforce the Gomes Loan Agreements and the other Loan Documents. Each Loan Party expressly waives any right to require Bank to marshal assets in favor of any Loan Party or any other person or to proceed against any other Loan Party or any Collateral provided by any person, and agrees that Bank may proceed against any Loan Party or any Collateral in such order as it shall determine in its sole and absolute discretion.

d.    Bank may file a separate action or actions against any Loan Party, whether action is brought or prosecuted with respect to any security or against any other person, or whether any other person is joined in any such action or actions. Each Loan Party agrees that Bank and any Loan Party and any affiliate of any Loan Party may deal with each other in connection with the Obligations or otherwise, or alter any contracts or agreements now or hereafter existing between any of them, in any manner whatsoever, all without in any way altering or affecting the continuing efficacy of the Gomes Loan Agreements or the other Loan Documents.

e.    Bank's rights under the Loan Documents shall be reinstated and revived, and the enforceability of the Gomes Loan Agreements and the other Loan Documents shall continue, with respect to any amount at any time paid on account of the Obligations which thereafter shall be required to be restored or returned by Bank, all as though such amount had not been paid. The rights of Bank created or granted herein and the enforceability of the Gomes Loan Agreements and the other Loan Documents at all times shall remain effective to cover the full amount of all the Obligations even though the Obligations, including any part thereof or any other security or guaranty therefor, may be or hereafter may become invalid or otherwise unenforceable as against any Loan Party and whether or not any other Loan Party shall have any personal liability with respect thereto.

f.    Each Loan Party has undertaken an independent investigation of the financial condition of the other Loan Parties and is not relying (and has not relied) on any information furnished by the Bank. Each Loan Party assumes full responsibility for obtaining any further information concerning the other Loan Parties' financial condition, the status of the Obligations or any other matter which such Loan Party may deem necessary or appropriate from time to time. Each Loan Party waives any duty on the part of the Bank, and agrees that it is not relying upon nor expecting the Bank to disclose to such Loan Party any fact now or later known by the Bank, whether relating to the operations or condition of any Loan Party, the existence, liabilities or financial condition of any other party obligated with respect to the Obligations, the occurrence of any default with respect to the Obligations, the condition or value of any Collateral, or otherwise, notwithstanding any effect these facts may have upon such Loan Party's risk under the applicable Loan Documents. Each Loan Party knowingly accepts the full range of risk encompassed in the applicable Loan Documents.

g.    To the maximum extent permitted by applicable law, each Loan Party expressly waives any and all defenses now or hereafter arising or asserted by reason of (a) any disability or other defense of any other Loan Party with respect to the Obligations, (b) the unenforceability or invalidity of any security or guaranty for the Obligations or lack of perfection or continuing perfection or failure of priority of any security for the Obligations, (c) the cessation for any cause whatsoever of the liability of any other Loan Party (other than by reason of the full payment and performance of all Obligations), (d) any failure of the Bank to marshal assets in favor of Bank or any Loan Party or any other person, (e) any act or omission of Bank or others that directly or indirectly results in or aids the discharge or release of any Loan Party or the Obligations or any security or guaranty therefor by operation of law or otherwise, (f) any law which provides that the obligation of a surety or guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal or which reduces a surety's or guarantor's obligation in proportion to the principal obligation, (g) any failure of Bank to file or enforce a claim in any bankruptcy or other proceeding with respect to any person, (h) the election by Bank of the application or non-application of Section 1111(b)(2) of the United States Bankruptcy Code, (i) any extension of credit or the grant of any lien under Section 364 of the United States Bankruptcy Code, (j) any use of cash collateral under Section 363 of the United States Bankruptcy Code, (k) any agreement or stipulation with respect to the provision of adequate protection in any bankruptcy proceeding of any person, (l) the avoidance of any lien in favor of Bank for any reason, or (m) any action taken by Bank that is authorized by the Gomes Loan Agreements or any other provision of any Loan Document. Until such time as all of the Obligations have been fully, finally, and indefeasibly paid in full in cash: (i) each Loan Party hereby waives and postpones

any right of subrogation it has or may have as against any other Loan Party with respect to the Obligations; and (ii) in addition, each Loan Party also hereby waives and postpones any right to proceed or to seek recourse against or with respect to any property or asset of any other Loan Party. Each Loan Party expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Obligations, and all notices of acceptance of the Gomes Loan Agreements or the other Loan Documents or of the existence, creation or incurring of new or additional Obligations.

h.      Notwithstanding the rights given to the Loan Parties pursuant to California Civil Code sections 1479, 2822, 2899 or 3433, to designate how payments will be applied or to require Bank to marshal assets, the Loan Parties hereby waive such rights and Bank shall have the right in its sole discretion to determine the order and method of the application of payments to the Obligations and the exercise of rights and remedies in the Collateral. Bank may revise any application prospectively or retroactively at Bank's discretion. WITHOUT LIMITING THE GENERALITY OF ANY OTHER WAIVER OR OTHER PROVISION SET FORTH HEREIN OR IN ANY LOAN DOCUMENT, EACH LOAN PARTY HEREBY WAIVES, TO THE MAXIMUM EXTENT SUCH WAIVER IS PERMITTED BY LAW, ANY AND ALL BENEFITS, DEFENSES TO PAYMENT OR PERFORMANCE, OR ANY RIGHT TO PARTIAL OR COMPLETE EXONERATION ARISING DIRECTLY OR INDIRECTLY UNDER ANY ONE OR MORE OF CALIFORNIA CIVIL CODE SECTIONS 2799 THROUGH 2855, INCLUSIVE.

22.    **Reaffirmation of Guarantees**. Each Guarantor hereby reaffirms its respective obligations under its respective Guarantee.

23.    **Financial Statements of Individual Guarantors.** By no later than August 17, 2009, each Individual Guarantor shall deliver to Bank his current financial statement, in form and detail satisfactory to Bank in its reasonable discretion. Failure by any Individual Guarantor to deliver such financial statement by the above date shall constitute an immediate Forbearance Default hereunder.

24.    **Miscellaneous Provisions**.

a.      **Effect of Agreement.** Except as specifically amended by this Agreement, all of the representations, warranties, terms and conditions of the Loan Documents remain unaltered and in full force and effect in accordance with their respective terms. In the event of any inconsistency between the terms of this Agreement and any other Loan Document, this Agreement shall govern. Each Loan Party acknowledges that it has consulted with counsel and such other experts and advisors as it deems necessary in connection with the negotiation, execution and delivery of this Agreement, or has had an opportunity to so consult and has knowingly chosen not to do so. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto, their respective successors and assigns. No other person shall be entitled to claim any right or benefit hereunder, except the Released Parties. Nothing herein shall constitute a novation of any Loan Document.

b.      **Reversal of Payments.** If Bank receives any payments or any rents, issues, profits or proceeds of any Collateral which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be paid to a trustee, receiver or any other party under any bankruptcy law, common law, statute, equitable cause or otherwise, then, to

such extent, the obligations or part thereof intended to be satisfied by such payments or proceeds shall be reserved and continue as if such payments or proceeds had not been received by Bank.

c.    **Severability.** In case any provision of this Agreement shall be invalid, illegal or unenforceable, such provision shall be severable from the remainder of this Agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

d.    **Applicable Law; Jurisdiction.** This Agreement and all other Loan Documents and the rights and obligations of the parties hereto and thereto shall be governed by the laws of the State of California without regard to principles concerning choice of law.

e.    **Attorneys' Fees.** Upon demand by Bank, Loan Parties shall reimburse Bank for all costs and expenses including, without limitation, appraisal fees and costs, attorneys' fees, and disbursements (determined on the basis of such counsel's generally applicable rates, which may be higher than the rates such counsel charges Bank in certain matters) (and fees and disbursements of Bank's in-house legal counsel and staff) expended or incurred by Bank in connection with: (a) the negotiation, preparation, amendment, interpretation and enforcement of the Loan Documents including, without limitation, during any workout, attempted workout, and/or in connection with the rendering of legal advice as to Bank's rights, remedies and obligations under the Loan Documents; (b) any arbitration, mediation, judicial reference proceeding, or other legal action related to any Loan Documents, (c) collecting any sum which becomes due Bank under any Loan Document; (d) any proceeding for declaratory relief, any counterclaim to any proceeding, or any appeal; or (e) the protection, preservation or enforcement of any rights of Bank. This includes, subject to any limits under applicable law, Bank's attorneys' fees and Bank's legal expenses, whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. All such amounts shall be Obligations secured by the Collateral.

f.    **Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

g.    **Notices.** Any notices or other communications provided for or allowed under any Loan Documents shall be effective only when given by one of the following methods and addressed to the respective party at its address given with the signatures at the end of this Agreement and shall be considered to have been validly given; (a) upon delivery, if delivered personally; (b) upon receipt, if mailed, first class postage prepaid, with the United States Postal Service; (c) on the next business day if sent by overnight courier service of recognized standing; and (d) upon telephoned confirmation of receipt, if telecopied.

h.    **JURY TRIAL WAIVER.** EACH OF THE LOAN PARTIES ACKNOWLEDGES THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, EACH OF THE LOAN PARTIES, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE

EVENT OF LITIGATION REGARDING THE PERFORMANCE OR
ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT OR
ANY OTHER LOAN DOCUMENTS.

i.    **Reference Provision**.

    A.    In the event that the Jury Trial Waiver provision contained in this Agreement or any other Loan Document is not enforceable, the parties elect to proceed under this Reference Provision.

    B.    Each of the Loan Parties and Bank agree that the following Reference Provision shall hereby be made a part of this Agreement and any agreement, instrument or document made or entered into by any of them with or in favor of Bank (collectively, the "Loan Party Agreement") and is hereby incorporated into any such Loan Party Agreement by this reference.

    C.    With the exception of the items specified in clause (D), below, any controversy, dispute or claim (each, a "Claim") between the parties arising out of or relating to the Loan Party Agreement will be resolved by a reference proceeding in California in accordance with the provisions of Section 638 et seq. of the California Code of Civil Procedure ("CCP"), or their successor sections, which shall constitute the exclusive remedy for the resolution of any Claim, including whether the Claim is subject to the reference proceeding. Except as otherwise provided in the Loan Party Agreement, venue for the reference proceeding will be in the state or federal court in the county or district where venue is otherwise appropriate under applicable law (the "Court").

    D.    The matters that shall not be subject to a reference are the following: (a) foreclosure of any security interests in real or personal property, (b) exercise of self-help remedies (including, without limitation, set-off), (c) appointment of a receiver and (d) temporary, provisional or ancillary remedies (including, without limitation, writs of attachment, writs of possession, temporary restraining orders or preliminary injunctions). This Reference Provision does not limit the right of any party to exercise or oppose any of the rights and remedies described in clauses (a) and (b) or to seek or oppose from a court of competent jurisdiction any of the items described in clauses (c) and (d). The exercise of, or opposition to, any of those items does not waive the right of any party to a reference pursuant to this Reference Provision.

    E.    The referee shall be a retired judge or justice selected by mutual written agreement of the parties. If the parties do not agree within ten (10) days of a written request to do so by any party, then, upon request of any party, the referee shall be selected by the Presiding Judge of the Court (or his or her representative). A request for appointment of a referee may be heard on an ex parte or expedited basis, and the parties agree that irreparable harm would result if ex parte relief is not granted. Pursuant to CCP § 170.6, each party shall have one peremptory challenge to the referee selected by the Presiding Judge of the Court (or his or her representative).

    F.    The parties agree that time is of the essence in conducting the reference proceedings. Accordingly, the referee shall be requested, subject to change in the

time periods specified herein for good cause shown, to (a) set the matter for a
status and trial-setting conference within fifteen (15) days after the date of
selection of the referee, (b) if practicable, try all issues of law or fact within one
hundred twenty (120) days after the date of the conference and (c) report a
statement of decision within twenty (20) days after the matter has been submitted
for decision.

G.      The referee will have power to expand or limit the amount and duration of
discovery. The referee may set or extend discovery deadlines or cutoffs for good
cause, including a party's failure to provide requested discovery for any reason
whatsoever. Unless otherwise ordered, no party shall be entitled to "priority" in
conducting discovery, depositions may be taken by either party upon seven (7)
days written notice, and all other discovery shall be responded to within fifteen
(15) days after service. All disputes relating to discovery which cannot be
resolved by the parties shall be submitted to the referee whose decision shall be
final and binding.

H.      Except as expressly set forth in this Reference Provision, the referee shall
determine the manner in which the reference proceeding is conducted including
the time and place of hearings, the order of presentation of evidence, and all other
questions that arise with respect to the course of the reference proceeding. All
proceedings and hearings conducted before the referee, except for trial, shall be
conducted without a court reporter, except that when any party so requests, a
court reporter will be used at any hearing conducted before the referee, and the
referee will be provided a courtesy copy of the transcript. The party making such
a request shall have the obligation to arrange for and pay the court reporter.
Subject to the referee's power to award costs to the prevailing party, the parties
will equally share the cost of the referee and the court reporter at trial.

I.      The referee shall be required to determine all issues in accordance with existing
case law and the statutory laws of the State of California. The rules of evidence
applicable to proceedings at law in the State of California will be applicable to
the reference proceeding. The referee shall be empowered to enter equitable as
well as legal relief, enter equitable orders that will be binding on the parties and
rule on any motion which would be authorized in a trial, including without
limitation motions for summary judgment or summary adjudication. The referee
shall issue a decision at the close of the reference proceeding which disposes of
all claims of the parties that are the subject of the reference. Pursuant to CCP §
644, such decision shall be entered by the Court as a judgment or an order in the
same manner as if the action had been tried by the Court and any such decision
will be final, binding and conclusive. The parties reserve the right to appeal from
the final judgment or order or from any appealable decision or order entered by
the referee. The parties reserve the right to findings of fact, conclusions of laws,
a written statement of decision, and the right to move for a new trial or a different
judgment, which new trial, if granted, is also to be a reference proceeding under
this provision.

J.      If the enabling legislation which provides for appointment of a referee is repealed
(and no successor statute is enacted), any dispute between the parties that would
otherwise be determined by reference procedure will be resolved and determined
by arbitration. The arbitration will be conducted by a retired judge or Justice, in

accordance with the California Arbitration Act §1280 through §1294.2 of the CCP as amended from time to time. The limitations with respect to discovery set forth above shall apply to any such arbitration proceeding.

K.    THE PARTIES RECOGNIZE AND AGREE THAT ALL DISPUTES RESOLVED UNDER THIS REFERENCE PROVISION WILL BE DECIDED BY A REFEREE AND NOT BY A JURY.  AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR OWN CHOICE, EACH PARTY KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, AGREES THAT THIS REFERENCE PROVISION WILL APPLY TO ANY CONTROVERSY, DISPUTE OR CLAIM BETWEEN OR AMONG THEM WHICH ARISES OUT OF OR IS RELATED TO THE LOAN PARTY AGREEMENT.

j.    **Non Waiver**.  In the event that Bank elects to waive any rights or remedies hereunder or under any other Loan Documents, or compliance with any of the terms hereof, or delays or fails to pursue or enforce any term, such waiver, delay or failure to pursue or enforce shall only be effective with respect to that single act and shall not be construed to affect any subsequent transactions or Bank's right to later pursue such rights and remedies.

k.    **Further Assurances**.  The Loan Parties shall execute such additional documents and take such additional actions as Bank may request to carry out the purpose and intent of this Agreement and the other documents to be executed as provided herein.

l.    **Time is of the Essence**.  Time is of the essence in the performance of this Agreement.

m.    **Entire Agreement**.  This Agreement and the Loan Documents are intended by the parties as the final expression of their agreement and therefore contain the entire agreement between the parties and supersede all prior understandings or agreements concerning the subject matter hereof.  This Agreement may only be amended in a writing signed by Bank and the other parties to such amendment.

n.    **No Adequate Remedy at Law**.  The Loan Parties acknowledge and agree that damages will not adequately compensate Bank for a breach of the terms of this Agreement and that, as such, Bank shall be entitled to specific performance of this Agreement.

o.    **Execution in Counterparts; Facsimile**.  This Agreement may be executed in two or more counterparts and via facsimile, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the parties.

**IN WITNESS WHEREOF**, Bank and each of the Loan Parties have executed this Agreement as of the date set forth in the preamble.

"**LOAN PARTIES**"                                    "**BANK**"

GOMES ENTERPRISES, LLC                U.S. BANK NATIONAL ASSOCIATION

By: _____        By: _____
Title: _Presidenent_____          Title: _____

UNLIMITED METALS, INC.                **Address for notices to Bank:**

By: _____         PD-OR-P5SA
Title: __Secretary_____          555 SW Oak Street, Suite 505
                                     Portland, OR 97204
                                     Attn:  Elizabeth C. Hengeveld
                                     Telephone No. (503) 275-6987
_____     FAX No. (503) 275-5919
DAVID F. GOMES


_____
SAM KUK LEE


_____
SEONG (STEVE) JOON HWANG


**Address for notices to Loan Parties:**

2900 N. Alameda Street
Compton, CA 90222
Telephone No. (310) 608-5321
FAX No. (310) 608-0281

W02-WEST:1BEW2\401709406.7                    -19-

**IN WITNESS WHEREOF**, Bank and each of the Loan Parties have executed this Agreement as of the date set forth in the preamble.

**"LOAN PARTIES"**                      **"BANK"**

GOMES ENTERPRISES, LLC                  U.S. BANK NATIONAL ASSOCIATION

By: _____                 By: _____
Title: _____              Title: _____

UNLIMITED METALS, INC.                   **Address for notices to Bank:**

By: _____                  PD-OR-P5SA
Title: _____               555 SW Oak Street, Suite 505
                                         Portland, OR 97204
                                         Attn: Elizabeth C. Hengeveld
_____                      Telephone No. (503) 275-6987
DAVID F. GOMES                           FAX No. (503) 275-5919

_____
SAM KUK LEE

_____
SEONG (STEVE) JOON HWANG

**Address for notices to Loan Parties:**

2900 N. Alameda Street
Compton, CA 90222
Telephone No. (310) 608-5321
FAX No. (310) 608-0281

TOTAL P.01

**IN WITNESS WHEREOF**, Bank and each of the Loan Parties have executed this Agreement as of the date set forth in the preamble.

"LOAN PARTIES"

GOMES ENTERPRISES, LLC

By: _____
Title: _____


UNLIMITED METALS, INC.

By: _____
Title: _____


_____
DAVID F. GOMES


_____
SAM KUK LEE


_____
SEONG (STEVE) JOON HWANG


**Address for notices to Loan Parties:**

2900 N. Alameda Street
Compton, CA 90222
Telephone No. (310) 608-5321
FAX No. (310) 608-0281


"BANK"

U.S. BANK NATIONAL ASSOCIATION

By: *Elizabeth C. Hengeveld*
Title: *Senior Vice President*


**Address for notices to Bank:**

PD-OR-P5SA
555 SW Oak Street, Suite 505
Portland, OR 97204
Attn:  Elizabeth C. Hengeveld
Telephone No. (503) 275-6987
FAX No. (503) 275-5919

**EXHIBIT A**

**SEE ATTACHED APPROVED BUDGET**

Genes Enterprises, LLC, d.b.a. A to Z Metals
TWO WEEK CASH FLOW PROJECTION
FOR PERIODS AUGUST 7, 2009 THROUGH AUGUST 21, 2009

| | 08/07/09 | 08/08/09 | 08/09/09 | 08/10/09 | 08/11/09 | 08/12/09 | 08/13/09 | 08/14/09 | 08/15/09 | 08/16/09 | 08/17/09 | 08/18/09 | 08/19/09 | 08/20/09 | 08/21/09 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | | | | | | | | | | | | | |
| Cash On Hold At U.S. Bank | | | | 409,417 | | | | | | | | | | | | 409,417 |
| Cash To Be Received From Customers | 77,712 | | | 164,341 | 164,341 | 164,341 | 164,341 | 164,341 | | | 67,422 | 67,422 | 67,422 | 67,422 | 67,422 | 1,236,525 |
| Cash To Be Received From Customers-Export | | | | 250,000 | | | | | | | | | | | | 250,000 |
| Projected Cash Sales To Customers (COD, CAD, Net 3-5 Sales) | 100,000 | | | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | | | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,100,000 |
| Total Cash To Be Received | 177,712 | | | 923,758 | 264,341 | 264,341 | 264,341 | 264,341 | | | 167,422 | 167,422 | 167,422 | 167,422 | 167,422 | 2,995,942 |
| Cash To Be Paid To Dock Customers | 90,000 | 90,000 | | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 1,170,000 |
| Cash To Be Paid To Dealers (Averaged) | 10,000 | | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 110,000 |
| Cash To Be Paid For Other Current Metal Purchases | | | | 80,801 | 108,207 | 111,416 | 62,236 | 97,651 | | | 95,380 | 98,272 | 108,429 | 40,530 | 65,397 | 868,319 |
| Cash To Be Paid For Payroll | 42,087 | | | | | | | 42,087 | | | | | | | 42,087 | 126,261 |
| Cash To Be Paid For Other Non-Metals Payables | | | | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | | | 37,000 | | | | | 337,000 |
| Interest To Be Paid | | | | | | | | | 7,926 | | | | | | | 7,926 |
| Outstanding Checks | | | | 356,000 | | | | | | | | | | | | 356,000 |
| Total Cash To Be Paid For Operations | 142,087 | 90,000 | | 596,801 | 268,207 | 271,416 | 222,236 | 299,738 | 97,926 | | 232,380 | 198,272 | 208,429 | 140,530 | 207,484 | 2,975,506 |
| Net Cash Provided By (Used In) Operating Activities | 35,625 | (90,000) | | 326,957 | (3,866) | (7,075) | 42,105 | (35,397) | (97,926) | | (64,958) | (30,850) | (41,007) | 26,892 | (40,062) | 20,436 |
| **Cash Flows From Financing Activities:** | | | | | | | | | | | | | | | | |
| Payments On Obligations Under Capital Leases | | | | 23,534 | | | | | | | | | | | | 23,534 |
| Payments On Long-Term Debt | | | | | | | | | 89,583 | | | | | | | 89,583 |
| Net Cash Used In Financing Activities | | | | 23,534 | | | | | 89,583 | | | | | | | 113,117 |
| Net Cash Provided By (Used In) Operating And Financing Activities | 35,625 | (90,000) | | 303,423 | (3,866) | (7,075) | 42,105 | (35,397) | (187,509) | | (64,958) | (30,850) | (41,007) | 26,892 | (40,062) | (92,681) |

**Notes:**

Assumption #1 - The cash received from customers is based on the assumption that the Company will collect $77,712 for the week ending 8/7/09, $821,703 for the week ending 8/14/09, and $337,110 for the week ending 8/21/09. These collection do not include any future sales. The remaining accounts receivable of $144,080 will be collected in future weeks and does not appear in this schedule.

Assumption #2 - The cash to be paid for metals purchases is based on the company's current amounts due to their vendors for product purchased with a current balance of $3.1 million that end approximately $500,000 due per week. The $500,000 has been average over a 5 day work week totally $100,000 per day.

Assumption #3 - The cash to be paid for payroll is based on taking the total salaries, health insurance, payroll taxes, and payroll fees expenses as of June 30, 2009 and divided by 26 pay periods (every Friday).

Assumption #4 - The cash to be paid for non-metals payables is based on the company's current amounts due to their vendors for various expenses not directly related to metal purchases with an approximately balance of $336,000 with approximately $300,000 due next week. The $300,000 has been average over the 5 day work week totaling $60,000 per day.

W02-WEST:1BEW2\401709406.7

**EXHIBIT B**

**SEE ATTACHED CONSOLIDATED BASELINE BORROWING BASE CERTIFICATE**

## GOMES ENTERPRISES, LLC

### DAILY COLLATERAL CERTIFICATE

| | Today's Date | As of Date |
|---|---|---|
| CCG  Updated | 8/7/09 | 8/6/09 |

**ACCOUNTS RECEIVABLE** | | | | **Combined**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1) | Beginning / Previous day's ending balance | | | | | $2,319,904.14 |
| 2) | (ADD) | Gross sales per sales journal | | | | $278,013.11 |
| 3) | (MINUS) | Cash receipts per cash receipts journal | | | | ($241,076.72) |
| 4) | (ADD) | Debit memos, returned checks or other adjustments | | | | $613.94 |
| 5) | (MINUS) | Credit memos: | - | Write Offs: | - | - |
| | | Discounts: | $0 | Contra Offsets: | - | $0 |
| | | Rebates: | $0 | Other Credit Adjustment: | - | - |
| 6) | End of day aging balance: | | | | | $2,357,454.47 |
| 7) | (MINUS)  INELIGIBLES  (from Schedule A) | | | | | $1,108,321.02 |
| 8) | ELIGIBLE A/R (Line 6 minus Line 7 @ advance rate): | | | 80% | | $999,306.76 |
| | **Combined Eligible A/R** | | | | | |

**INVENTORY** | | | | 8/6/09 **Quantity / Lbs.**

| | | | Quantity / Lbs. | |
|---|---|---|---|---|
| 9) | Beginning / Previous day's ending balance | 12,902,660 | $ | 2,922,458.82 |
| 10) | (ADD) | Public Purchases per scale ticket at actual price | 1,006,137 | $ | 206,038.21 |
| 11) | (ADD) | Dealer Purchases at prior month ending average price | 543,918 | $ | 300,628.62 |
| 12) | (Minus) | Sales at the running average price | (1,267,565) | $ | (224,615.59) |
| 13) | (ADD) | A to Z Metales | - | $ | 119,331.65 |
| 14) | (ADD) | Processing Capitalization | N/A | $ | 606,516.91 |
| 15) | End of day Inventory balance: | 13,960,830 | $ | 4,411,585.23 |
| 16) | General Ledger balance: | | | |
| 17) | INELIGIBLE INVENTORY: (from Schedule A) | | | $130,181.65 |
| 18) | ELIGIBLE INVENTORY: (Lesser of Line 9 minus Line 10 @ advance rate or maximum limit, below) | | $ | 4,281,403.58 |
| | Advance rate: | 60% | Maximum Limit: | $2,568,842 | $2,568,842.15 |
| | Eligible INV not to exceed 60% of Borrowbase. | | | | |

| | | | | |
|---|---|---|---|---|
| 19) | **MAXIMUM AVAILABLE:** (Sum of Line 8 and Line 11 or maximum limit) | $18,400,000 | $3,568,148.91 |
| | | (Principal Line Amount) | **$3,568,149** |

**LOAN DETAIL**

| | | | | |
|---|---|---|---|---|
| 20) | Line of Credit Outstanding: | | 14,160,968 | |
| | Commercial Letters of Credit (100%) | | 0 | |
| | Standby Letters of Credit  (100%) | | 0 | |
| | Standby IDB-(100%) | | | |
| | Other loans (Reserved under base) | | 0 | |
| 21) | **TOTAL LOANS OUTSTANDING:** (Sum of Loan Detail) | 7/31/2009 | $14,160,968.00 |
| 22) | **REMAINING AVAILABLE:** (Line 12 minus Line 14) | | ($10,592,819.09) |

---

*The undersigned represents and warrants that:*

The foregoing information is true, complete and correct, and that the collateral, designated as eligible, hereby complies fully with the conditions, terms, warranties, representations and covenants set forth in the Loan Agreement ("Agreement") between the undersigned and U.S. Bank ("Lender").

---

| **GOMES ENTERPRISES, LLC** | | |
|---|---|---|
| Borrower | Authorized signature | Date |

## SCHEDULE A

## COMPUTATION OF INELIGIBLES

**Date:** | 8/7/2009 |

| INELIGIBLE ACCOUNTS RECEIVABLE: | Borrower | Combined |
|---|---|---|
| Prior 90 days past invoice (or 60 days from due date on N30 terms) | | 118,103.88 |
| Credits in Prior | | 0.00 |
| Cross-aged accounts at: 20% | | 22,991.23 |
| Contra accounts | | 6,815.10 |
| Employee/ intercompany accounts /affiliates    (Southwest Metals/ Calgary Metal) | | 0.00 |
| Claims/Disputed | | 124,421.92 |
| Foreign Accts. -no L/C or Foreign Credit Insurance including the | | |
| Accts. No Ins.    x-aged | | 0 |
| Excess of 20% DCL  World Commodities | | 570,319.94 |
| U.S. Government | | 0.00 |
| COD and T/T Terms | | 265,668.95 |
| Variance between aging & general ledger (if general ledger is lower than aging) & Debit memos on BBC | | 0.00 |
| **SUB-TOTAL** | | 1,108,321.02 |
| Concentration limitation -- excess over: 20% | | 0.00 |
| **TOTAL INELIGIBLE ACCOUNTS RECEIVABLE** | | 1,108,321.02 |
| **INELIGIBLE INVENTORY** | | |
| Variance between inventory report and general ledger (if general ledger is lower) | | 0.00 |
| Work-in-process | | 10,850.00 |
| In-transit inventory | | 0.00 |
| Consignment inventory, inventory at other locations (Mexico & off-site) | | 119,331.65 |
| Other ineligible inventory (obsolete, defective, discontinued, slow moving, returns, etc.) | | 0.00 |
| **TOTAL INELIGIBLE INVENTORY**    (Transfer to line 10) | | 130,181.65 |

## GOMES ENTERPRISES, LLC

### DAILY COLLATERAL CERTIFICATE

CCG  Updated

|  | Today's Date | As of Date |
|---|---|---|
|  | 8/7/09 | 8/6/09 |

**ACCOUNTS RECEIVABLE** — Unlimited

| | | | |
|---|---|---|---|
| 1) | | Beginning / Previous day's ending balance | $0.00 |
| 2) | (ADD) | Gross sales per sales journal | $0.00 |
| 3) | (MINUS) | Cash receipts per cash receipts journal | $0.00 |
| 4) | (ADD) | Debit memos, returned checks or other adjustments | $0.00 |
| 5) | (MINUS) | Credit memos: -  Write Offs: | - |
| | | Discounts: $0   Contra Offsets: - | $0 |
| | | Rebates: $0   Other Credit Adjustments - | - |
| 6) | | End of day aging balance: | $0.00 |
| 7) | (MINUS) | INELIGIBLES (from Schedule A) | $0.00 |
| 8) | | ELIGIBLE A/R (Line 6 minus Line 7 @ advance rate):  80% | $0.00 |
| | | **Combined Eligible A/R** | |

**INVENTORY**

8/6/09
Quantity / Lbs.

| | | | | |
|---|---|---|---|---|
| 9) | Beginning / Previous day's ending balance | - | $ | - |
| 10) | (ADD) Public Purchases per scale ticket at actual price | - | $ | - |
| 11) | (ADD) Dealer Purchases at prior month ending average price | - | $ | - |
| 12) | (Minus) Sales at the running average price | - | $ | - |
| 13) | (ADD) A to Z Metales | | | |
| 14) | (ADD) Processing Capitalization | N/A | | |
| 15) | End of day Inventory balance: | 775,680 | $ | 481,226.61 |
| 16) | General Ledger balance: | | | |
| 17) | INELIGIBLE INVENTORY: (from Schedule A) | | | $10,850.00 |
| 18) | ELIGIBLE INVENTORY: (Lesser of Line 9 minus Line 10 @ advance rate or maximum limit, below) | | $ | 470,376.61 |
| | Advance rate: 60%   Maximum Limit: $282,226 | | | $282,225.97 |
| | Eligible INV not to exceed 60% of Borrowbase. | | | |

| 19) | **MAXIMUM AVAILABLE:** (Sum of Line 8 and Line 11 or maximum limit) | $18,400,000 | $282,225.97 |
|---|---|---|---|
| | | (Principal Line Amount) | **$282,226** |

---

***The undersigned represents and warrants that:***

The foregoing information is true, complete and correct, and that the collateral, designated as eligible, hereby complies fully with the conditions, terms, warranties, representations and covenants set forth in the Loan Agreement ("Agreement") between the undersigned and U.S. Bank ("Lender").

---

**GOMES ENTERPRISES, LLC**

Borrower                    Authorized signature                    Date

## SCHEDULE A

## COMPUTATION OF INELIGIBLES

Date: | 8/7/2009 |

| INELIGIBLE ACCOUNTS RECEIVABLE: | Borrower | Unlimited |
|---|---|---|
| Prior 90 days past invoice (or 60 days from due date on N30 terms) | | 0.00 |
| Credits in Prior | | 0.00 |
| Cross-aged accounts at: | 20% | 0.00 |
| Contra accounts | | 0.00 |
| Employee/ intercompany accounts /affiliates    (Southwest Metals/ Calgary Metal) | | 0.00 |
| Claims/Disputed | | 0.00 |
| Foreign Accts. -no L/C or Foreign Credit Insurance including the | | |
| Accts. No Ins.    x-aged | | |
| Excess of 20% DCL  World Commodities | | 0.00 |
| U.S. Government | | 0.00 |
| COD and T/T Terms | | 0.00 |
| Variance between aging & general ledger (if general ledger is lower than aging) & Debit memos on BBC | | 0.00 |
| **SUB-TOTAL** | | 0.00 |
| Concentration limitation -- excess over: | 20% | 0.00 |
| **TOTAL INELIGIBLE ACCOUNTS RECEIVABLE** | | 0.00 |

| INELIGIBLE INVENTORY | | |
|---|---|---|
| Variance between inventory report and general ledger (if general ledger is lower) | | |
| Broker to Invoice (Prepaid Inventory) | | 10,850.00 |
| In-transit inventory | | |
| Consignment inventory, inventory at other locations (Mexico & off-site) | | |
| Other ineligible inventory (obsolete, defective, discontinued, slow moving, returns, etc.) | | |
| **TOTAL INELIGIBLE INVENTORY** | (Transfer to line 10) | 10,850.00 |

| GOMES ENTERPRISES, LLC |
|:---:|

## DAILY COLLATERAL CERTIFICATE

| | CCG  Updated | | Today's Date | As of Date | |
|---|---|---|---|---|---|
| | | | 8/7/09 | 8/6/09 | |

| | | ACCOUNTS RECEIVABLE | | | A to Z |
|---|---|---|---|---|---|
| 1) | | Beginning / Previous day's ending balance | | | $2,319,904.14 |
| 2) | (ADD) | Gross sales per sales journal | | | $278,013.11 |
| 3) | (MINUS) | Cash receipts per cash receipts journal | | | ($241,076.72) |
| 4) | (ADD) | Debit memos, returned checks or other adjustments | | | $613.94 |
| 5) | (MINUS) | Credit memos: | - | Write Offs: | - |
| | | Discounts: | $0 | Contra Offsets: | - $0 |
| | | Rebates: | $0 | Other Credit Adjustment: | - - |
| 6) | | End of day aging balance: | | | $2,357,454.47 |
| 7) | (MINUS) | INELIGIBLES  (from Schedule A) | | | $1,108,321.02 |
| 8) | | ELIGIBLE A/R (Line 6 minus Line 7 @ advance rate): | | 80% | $999,306.76 |
| | | Combined Eligible A/R | | | |

| | | INVENTORY | 8/6/09 | | |
|---|---|---|---|---|---|
| | | | Quantity / Lbs. | | |
| 9) | | Beginning / Previous day's ending balance | 12,902,660 | $ | 2,922,458.82 |
| 10) | (ADD) | Public Purchases per scale ticket at actual price | 1,006,137 | $ | 206,038.21 |
| 11) | (ADD) | Dealer Purchases at prior month ending average price | 543,918 | $ | 300,628.62 |
| 12) | (Minus) | Sales at the running average price | (1,267,565) | $ | (224,615.59) |
| 13) | (ADD) | A to Z Metales | | $ | 119,331.65 |
| 14) | (ADD) | Processing Capitalization | N/A | $ | 606,516.91 |
| 15) | | End of day Inventory balance: | 13,185,150 | $ | 3,930,358.62 |
| 16) | | General Ledger balance: | | | |
| 17) | | INELIGIBLE INVENTORY:  (from Schedule A) | | | $119,331.65 |
| 18) | | ELIGIBLE INVENTORY:  (Lesser of Line 9 minus Line 10 @ advance rate or maximum limit, below) | | | $ 3,811,026.97 |
| | | Advance rate: | 60% | Maximum Limit: $2,286,616 | $2,286,616.18 |
| | | Eligible INV not to exceed 60% of Borrowbase. | | | |
| 19) | **MAXIMUM AVAILABLE:**  (Sum of Line 8 and Line 11 or maximum limit) | | **$18,400,000** | | $3,285,922.94 |
| | | | (Principal Line Amount) | | **$3,285,923** |

---

### *The undersigned represents and warrants that:*

The foregoing information is true, complete and correct, and that the collateral, designated as eligible, hereby complies fully with the conditions, terms, warranties, representations and covenants set forth in the Loan Agreement ("Agreement") between the undersigned and U.S. Bank ("Lender").

---

| GOMES ENTERPRISES, LLC | | |
|---|---|---|
| Borrower | Authorized signature | Date |

## SCHEDULE A

## COMPUTATION OF INELIGIBLES

**Date:** | 8/7/2009 |

| INELIGIBLE ACCOUNTS RECEIVABLE: | Borrower | AtoZ |
|---|---|---|
| Prior 90 days past invoice (or 60 days from due date on N30 terms) | | 118,103.88 |
| Credits in Prior | | 0.00 |
| Cross-aged accounts at: 20% | | 22,991.23 |
| Contra accounts | | 6,815.10 |
| Employee/ intercompany accounts /affiliates    (Southwest Metals/ Calgary Metal) | | 0.00 |
| Claims/Disputed | | 124,421.92 |
| Foreign Accts. -no L/C or Foreign Credit Insurance including the | | |
| Accts. No Ins.                                  x-aged | | |
| Excess of 20% DCL  World Commodities | | 570,319.94 |
| U.S. Government | | 0.00 |
| COD and T/T Terms | | 265,668.95 |
| *Variance between aging & general ledger (if general ledger is lower than aging) & Debit memos on BBC* | | 0.00 |
| **SUB-TOTAL** | | 1,108,321.02 |
| Concentration limitation -- excess over: 20% | | 0.00 |
| **TOTAL INELIGIBLE ACCOUNTS RECEIVABLE** | | 1,108,321.02 |

**INELIGIBLE INVENTORY**

| | | |
|---|---|---|
| Variance between inventory report and general ledger (if general ledger is lower) | | |
| Broker to Invoice (Prepaid Inventory) | | 0.00 |
| In-transit inventory | | |
| Consignment inventory, inventory at other locations (Mexico & off-site) | | 119,331.65 |
| Other ineligible inventory (obsolete, defective, discontinued, slow moving, returns, etc.) | | |
| **TOTAL INELIGIBLE INVENTORY** | (Transfer to line 10) | 119,331.65 |

**Gomes Enterprises, LLC ( A to Z Metals and Unlimited Metals, Inc.)**      **8/6/2009**

| | TOTAL | CURRENT | 0 TO 30 | 30 TO 45 | start 09/08<br>45 TO 60 | 60 TO 90 | OVER 90 | Ineligible |
|---|---|---|---|---|---|---|---|---|
| A to Z Metals | 2,357,454 | 601,185 | 931,807 | 269,814 | 154,738 | 281,806 | 118,104 | |
| Unlimited Met | - | - | - | - | - | - | - | |
| Grand Total | 2,357,454 | 601,185 | 931,807 | 269,814 | 154,738 | 281,806 | 118,104 | |
| | | | | | | | | 118,104 |

**Ineligibles**
**Over 60 days**                                                                               -
**20% Cross-Aged**

| | | | | |
|---|---|---|---|---|
| | | | 0 | |
| Custom Alloys Light Metals (Jan. invoices, 90 days) | | | 0 | - |
| | | | 0 | |
| | | | 0 | |
| Indalex | cross-aged | 0 | 0 | |
| Independent Metals | cross-aged | 0 | | |
| Ecology Auto Parts | cross-aged | 736.97 | | |
| Earth Metal Trading | cross-aged | 0 Foreign | | |
| Baja Metal Shredder S. de R.L. | cross-aged | 0 Foreign | | |
| CSC Trading | cross-aged | 0 | | |
| Northwest Recycling | cross-aged | 0 | | |
| Kawabata American Inc. | cross-aged | 0 | | |
| Recicladora California | cross-aged | 0 Foreign | | |
| Recicladora Aeropuerto | cross-aged | 10567.89 Foreign | | |
| Shantou Enterprise | cross-aged | 0 Foreign | | 22,991 |
| Custom Alloy Light Metals, Inc. | cross-aged | 0 | | |
| Custom Alloy Scrap Sales | cross-aged | 0 | | |
| S A Recycling | cross-aged | 0 | | |
| So Cal Metal Recycling | cross-aged | 0 Foreign | | |
| Southwest Metal Industries | cross-aged | 0 | | |
| Sunwest Metals | cross-aged | 0 | | |
| Superior Metals | cross-aged | 0 | | |
| Universal Metals | cross-aged | 11686.37 | | |
| Vi-cal Metals | cross-aged | 0 | | |
| Wabash Alloys LLC | cross-aged | | | |
| World Commodities | cross-aged | 0 | | |

**CLAIMS/DISPI** per audit 09/12/07                                            -    **124,422** All Cross Aged

**COD's**                                                             **265,669**

| | | |
|---|---|---|
| *Custom Alloy* | | 831.44 |
| *DBW* | | - |
| Dongnam | T/T and L/C | - |
| Earth Metal Trading, LTD. | T/T | 8,025.60 |
| Golden Earth Metal | T/T | - |
| Heisei Metals | T/T | - |
| Indalex | N7 | 9,705.15 |
| Kaiser | | 7,128.95 |
| Kawabata American | COD | - |
| Quantum Resource | COD | - |
| Recicladora California | COD and CLAIM | - |
| Resources Max Enterprises | T/T | - |
| S A Recycling | Net 10 | 2,532.84 |
| S A Recycling Terminal Island | Net 10 | 4,444.80 |
| Sanko Co., LTD Nagoya | T/T | - |
| Sanko -Saitama Co. LTD. | T/T | 77,649.39 |
| Sanko Maibara Co. LTD | T/T | - |
| Sigma Brothers | T/T | 46,202.86 |
| Silvor Co., LTD | COD | - |
| Superior Metals | T/T | 77,711.79 |
| The Golden Gate Trading Co. | T/T | 31,436.13 |
| Universal Metal Co., LTD. | T/T | - |
| Viking Fibres, Inc. | COD | - |

| | | | eligible | Ineligible | Hold BL | |
|---|---|---|---|---|---|---|
| **Interco/Affiliat** | Southwest Metal Industries | UMI | 0 | | A to Z Metals | -    - |
| **(No longer an AFFILIATE)** | | | | | | |
| ██████ | | Ato Z | 0 | | | - |
| | | Unltd | 0 | | | |
| **Foreign A/R supported by L/C-80% advance rate** | | | eligible | Ineligible | Hold BL | - |
| **with no cap** | Ace Metals | L/C | 0 | 0 | | |
| | Aldex Co., LTD. | | 21881.59 | 0 | | |
| This section | Aleris Nuevo L | Net 30/Net after45 | 0 | 0 | | |
| is all FOREIGN | Aglinton Offshore Limited | | 0 | 0 | | |
| A/R with L/C ar | Ahmed & Brotl | L/C | 0 | 0 | | |
| D/P. | Asahi Tokyo | T/T | 0 | 0 | | |
| | Baja Metal | Net 5 | 0 | 0 | | |
| | Daechang Indu | T/T | 0 | 0 | | |
| | Dongkuk Steel | | 0 | 0 | | |
| | Dongnam | L/C | 26745.02 | 0 | | |
| Part L/C and Bi | Earth Metal Tr | T/T | 0 | 0 | | |
| Lading | Eco Resource | T/T | 0 | 0 | | |
| | E-Top | L/C | 69933.58 | 0 | | |
| | Garam Co. LTD. | L/C | 0 | 0 | | |
| | Gloria Material | T/T | 0 | 0 | | |
| | Grand Metal | T/T | 0 | 0 | | |
| | Gwang Woo | | 0 | 0 | | |
| | Han Yung Met | L/C | 21406.86 | 0 | | |
| | Hanwa Co., L1 | T/T | 0 | 0 | | |
| | Hong Kong Ch | CAD | 0 | 0 | | |
| | Hye Rim Co., I | L/C | 0 | 0 | | |
| | I Zhuang Ent. | T/T | 0 | 0 | | |
| | Jakarta Cakral | T/T and L/C | 0 | 0 | | |
| | Jenyat Co LTD | | 0 | 0 | 0 | |
| | Jeong IL Industrial Machine L | | 0 | 0 | | |
| | Jin Yao Metal Recycling | | 0 | 0 | | |
| see e-mail from R | Matsumoto | DP | 0 | 0 | 0 | |
| | More Steel Co | L/C | 0 | 0 | 0 | |
| | Ningbo Deyi Ir | DP | 0 | 0 | | |
| | Ningbo Yinhai Import & Expor | | 0 | 0 | | |
| | Posco Special | TT & CAD | 0 | 0 | | |
| | PTPangeran | DP | 0 | 0 | | |
| | PT Interworld | T/T | 0 | 0 | | |
| | PT Lautan Ste | L/C | 0 | 0 | | |
| | Qmetal | T/T | 0 | 0 | | |
| | Recicladora A | CLAIM | 0 | 0 | | |
| | Recicladora A | CLAIM | 0 | 0 | 0 | |
| | Ronix Resourc | T/T | 0 | 0 | | |
| | SS Steel | L/C | 0 | 0 | | |
| | Sambo | L/C | 0 | 0 | | |
| | Samjung | L/C | 183760.93 | 0 | | |
| | Sanko Co.,LTI | T/T | 0 | 0 | | |
| | Sanko-Saitam | T/T | 0 | 0 | | |
| | Sejin | L/C | 0 | 0 | | |
| | Shantou Ent. | T/T & L/C | 0 | 0 | 0 | |
| | Shin Yang Met | L/C | 29434.17 | 0 | | |
| | Shyeh Sheng | L/C | 0 | 0 | | |
| | Sigma Bros | T/T | 0 | 0 | 0 | |
| | Slivor | COD/LC | 0 | 0 | | |
| | sino Prosperity | L/C | 257973.88 | 0 | | |
| | Sukwang Indu | T/t | 0 | 0 | | |
| | Superior Metal | T/T | 0 | 0 | | |
| | Sus-Tech Corporation | T/T | 0 | 0 | 0 | |
| | The Golden G: | T/T | 0 | 0 | | |
| | Toyota Tsush | T/T | 0 | 0 | | |
| | Tuck Co | T/T | 0 | 0 | | |
| Cross-aged | Universal Meta | Net 15 & T/T | 0 | 0 | past due | |
| | Wei Chih Stee | L/C | 0 | 0 | | |
| | Wooshin | L/C | 0 | 0 | 0 | |
| | Yang Bo Co.,L | L/C | 0 | 0 | | |
| | Yip Shing Kee Metal | | 0 | 0 | 0 | |
| | Xinghai (Grou | T/T 10% Dep. | 0 | 0 | 0 | |
| | | | 611136.03 | 0 | 0 | - |

Gomes Enterprises, LLC ( A to Z Metals and Unlimited Metals, Inc.)          5/31/2009

| | | A/R | A/P | | | | |
|---|---|---|---|---|---|---|---|
| Govt Contras | none | | | | | | · |
| | Atlas Metals & | 0 | 0 | 0 | A/R | | 6,815 |
| | All-Met Recycl | 0 | 0 | 0 | A/R | was already reserve for CLAIM | |
| | Arrow Recyclir | 504.4 | 272490.16 | 504.4 | A/R | was already reserve for CLAIM | |
| | Baja Metal Shı | 0 | 0 | 0 | | | |
| | CBM | 0 | 0 | 0 | A/R | | |
| | Calgary Metal | 0 | 0 | 0 | | | |
| | California Meta | 0 | 0 | 0 | | | |
| | City of Anaheir | 3933 | 8510.9 | 3933 | A/R | | |
| | Commonwealt | 0 | 0 | 0 | | | |
| | CSC Trading | 0 | 0 | 0 | A/R | was already reserve for CLAIM | |
| | Custom Alloy I | 1529.9 | 5737.05 | 1529.9 | A/R | | |
| | Custom Alloy S | 0 | 0 | 0 | A/P | | |
| Unlimited Metals | DBW & Assoc | 0 | 0 | 0 | A/P | | |
| | Elg Metals | 0 | 0 | 0 | A/R | | |
| | General Metal: | 0 | 0 | 0 | A/R | | |
| | Green Fox Me | 0 | 0 | 0 | A/R | | |
| | Hydro Alum | 0 | 0 | 0 | A/R | | |
| | Jack Engle & ( | 0 | 0 | 0 | A/P | | |
| | Kaiser Alum | 274139.96 | 847.8 | 847.8 | A/P | | |
| | Kawabata | 0 | 0 | 0 | A/R | | |
| | Las Palmas | 0 | 0 | 0 | A/R | | |
| | L L Trading Int | 0 | 0 | 0 | A/R | | |
| | N/E Metal Trac | 0 | 0 | 0 | A/R | | |
| | Northwest Rec | 0 | 0 | 0 | A/P | | |
| | Otto Steel | 0 | 0 | 0 | A/R | | |
| | Pacific Coast F | 0 | 0 | 0 | A/R | | |
| | Phillip Trading | 0 | 0 | 0 | A/R | was already reserve for CLAIM | |
| | Quantum Rese | 0 | 0 | 0 | | | |
| | Recicladora Ac | 0 | 0 | 0 | A/R | was already reserve for CLAIM | |
| | Recicladora Ca | 0 | 0 | 0 | A/R | was already reserve for CLAIM | |
| | Rumetco | 0 | 0 | 0 | A/R | | |
| | Simon Metals | 0 | 0 | 0 | A/R | past due | |
| | Southwest Me | 0 | 0 | 0 | A/P | past due | |
| | Star Scrap Me | 0 | 0 | 0 | A/P | | |
| | **SLE Metals** | 0 | 0 | 0 | A/P | Entire SLE Metals is ineligible. | |
| | Sunwest Meta | 0 | 0 | 0 | | was already reserve for CLAIM | |
| | Superior Metal | 0 | 0 | 0 | A/P | T/T | |
| | Tangent Tradi | 0 | 0 | 0 | A/P | | |
| | The David Jos | 0 | 0 | 0 | past due | | |
| | United Alloy M | 0 | 0 | 0 | A/R | | |
| | Universal Meta | 0 | 0 | 0 | 0 A/R | was already reserve for T/T | |
| | Vi-Cal | 0 | 0 | 0 | A/P | | |
| | World Commo | 0 | 0 | 0 | A/P | DCL 20% | |
| | | | | 6815.1 | | | |

570,319.94
464,035.32
106,284.62

Debit Memos in BBC

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Total Ineligible at 80%**

570,320

1,108,321



| Bill of Lading | | ineligible | | Bill of Lading | |
|---|---|---|---|---|---|
| $8,000,000.00 | Aca Metals      L/C | 0 | | 0 | |
| | A & C International | | | 0 | |
| CAP | Aldex Co., LTD. | 0 | | 0 | |
| Adv. Rate 70% | Aleris Nuevo L Net 30/Net after45 | 0 | | 0 | |
| | Allen Recyclin CLAIM | 0 | | 0 | was already reserve for CLAIM |
| | Alumix Co. LTD. | 0 | | 0 | |
| | Ahmed & Brotl L/C | 0 | | 0 | |
| | Asahi Tokyo    T/T | 0 | | 0 | |
| | Baja Metal      CLAIM | 0 | | 0 | |
| | Chinalight Ningbo Imp. & Exp. Co. Ltd. | 0 | | 0 | |
| | Daechang Ind T/T | 0 | | 0 | |
| | Dongkuk Steel | 0 | | 0 | |
| | Dongnam      L/C and T/T | 0 | | 0 | |
| | Earth Metal Tr T/T | 0 | | 0 | |
| | Eco Resource T/T | 0 | | 0 | |
| | Fuji Alum      T/T | 0 | | 0 | |
| | Fuji Kosan Co., LTD. COD | 0 | | 0 | |
| Bill of Lading | Gloria Material T/T | 0 | | 0 | |
| Bill of Lading | Golden Earth Metal T/T | 0 | | 0 | *NOT A FOREIGN LOCATED in ALHAMBRA per borrower.* |
| | Grand Metal    T/T | 0 | | 0 | |
| | Groupo Bujanc CLAIM | 0 | | 0 | |
| | Han Yung Met L/C | 0 | | 0 | |
| | Hanwa Co., L T T/T | 0 | | 0 | |
| | Hong Kong Ch CAD | 0 | | 0 | |
| | Huan Bao Steel LTD  CAD | 0 | | 0 | |
| | Hye Rim Co., I L/C | 0 | | 0 | |
| | i Zhuang Ent.  T/T | 0 | | 0 | |
| Bill of Lading | Jakarta Cakral T/T and L/C | 0 | | 0 | |
| | Jesus Manuel Net 30 | 0 | | 0 | |
| | Jin Yao Metal Recycling T/T | 0 | | 0 | |
| | Matsumoto      DP and T/T | 0 | | 0 | |
| | More Steel Co T/T | 0 | | 0 | |
| Bill of Lading | Ningbo Deyi Ir DP | 0 | | 0 | |
| Bill of Lading | Ningbo Yinhai Import T/T | 0 | | 0 | |
| Bill of Lading | Posco Special TT & CAD | 0 | | 0 | |
| | PTPangeran    L/C | 0 | | 0 | |
| Bill of Lading | PT Interworld  T/T | 0 | | 0 | |
| | PT Leutan Ste L and COD | 0 | | 0 | |
| | Qmetai         T/T | 0 | | 0 | |
| | Recicladora A CLAIM | 0 | | 0 | was already reserve for CLAIM |
| | Recicladora Aeropuerto CLAIM | 0 | | 0 | |
| | Recuperadora Internacional S.A. De | 0 | | 0 | was already reserve for CLAIM |
| | Ronix Resourc T/T | 0 | | 0 | |
| | SS Steel        L/C | 0 | | 0 | |
| | Sambo          L/C and COD | 0 | | 0 | |
| | Samjung        T/T | 0 | | 0 | |
| | Sanko Maibari T/T | 0 | | 0 | |
| | Sanko Co., LTD. Nagoya Port T/T | 0 | | 0 | |
| | Sanko-Saitam T/T | 0 | | 0 | |
| | Sejin            L/C | 0 | | 0 | |
| Bill of Lading | Seowon Co., LTD. | 0 | | 0 | |
| Bill of Lading | Shantou Ent.  T/T & L/C | 0 | | 0 | |
| | Shin Yang Met L/C | 0 | | | |
| | Shyeh Sheng  L/C | 0 | | | |
| Bill of Lading | Sigma Bros    T/T | 0 | | 0 | |
| | Silvor          T/T | 0 | | 0 | |
| | Sukwang Indu T/t | 0 | | | |
| | Superior Metal T/T | 0 | | | |
| | Sus-Tech Corporation T/T | 0 | | 0 | |
| Bill of Lading | The Golden G T/T | 0 | | 0 | |
| | Toyota Tsushc T/T | 0 | | | |
| | Trans-Global (Asia) Limited T/T | 0 | | 0 | |
| | Tuck Co        T/T | 0 | | 0 | |
| Bill of Lading | Universal Meti Net 15 & T/T | 0 | | 0 | |
| | Wei Chih Stee L/C | 0 | | | |
| | Win Korea Trading Pty. LTD. T/T | 0 | | 0 | |
| Bill of Lading | Wooshin LC and T/T | 0 | | 0 | |
| | Yang Bo Co., L L/C | 0 | | | |
| Bill of Lading | Yip Shing Kee Metal T/T | 0 | | 0 | |
| | Xinghai (Grour T/T 10% Dep. | 0 | | 0 | |
| | | | | 0 | 0 |
| | | ineligible | | | 0 |
| | | 70% | | | |
| Line 19 | $0.00 | | | - | L/C allowance |
| less | $0 | | | 0 | |
| | $0 | | | 70% | 0 |
| | | | | CAP $6.0MM | 6000000 |

EXHIBIT C

## METHODOLOGY FOR INTRA-WEEK ESTIMATION OF COSTS OF GOODS SOLD

Formula for the Inventory Costing using the roll-forward method:

1.  Use the average purchase price for costing of inventory.

2.  Costing of public purchases will use the actual (real time) purchase prices.

3.  Costing of dealer purchases will use the past week's average purchase prices.

4.  A separate column will be added for selling prices and shall be used for information and reference only for comparing the cost of goods sold.