EXHIBIT "B"

# Gomes Enterprises
## Projected Cash Flow and Availability

| Week Ending | As of 2/10 12-Feb | 19-Feb | 26-Feb | 5-Mar | 12-Mar | Total |
|---|---|---|---|---|---|---|
| Cash Receipts (a) | 606,025 | 780,677 | 767,033 | 843,651 | 865,527 | 3,862,913 |
| Cash Disbursements - Metals | | | | | | |
| Dealers | - | 428,500 | 720,000 | 580,000 | 505,000 | 2,233,500 |
| Docks | - | 175,000 | 250,000 | 250,000 | 250,000 | 925,000 |
| Total Inventory | - | 603,500 | 970,000 | 830,000 | 755,000 | 3,158,500 |
| Operating Expenses | 6,000 | 174,000 | 177,320 | 217,000 | 138,000 | 712,320 |
| Total Disbursements | 6,000 | 777,500 | 1,147,320 | 1,047,000 | 893,000 | 3,870,820 |
| Net Cash | 600,025 | 3,177 | (380,287) | (203,349) | (27,473) | (7,907) |

(a) Equals balance as of February 10th plus sbusequent collected, undeposited cash for th week.

Confidential

EXHIBIT "B"

## Gomes Enterprises
### Projected Cash Flow and Availability
As of 2/10

| Week Ending | 12-Feb | 19-Feb | 26-Feb | 5-Mar | 12-Mar | Total |
|---|---|---|---|---|---|---|
| **Collateral Cash Account** | | | | | | |
| Beginning Balance | $458,431 | $147,594 | $193,528 | $170,792 | $170,672 | $458,431 |
| Collections | 147,594 | 780,677 | 767,033 | 843,651 | 865,527 | 3,404,482 |
| Transfers to Operating - one day lag | (458,431) | (734,743) | (789,769) | (843,772) | (861,611) | (3,688,327) |
| Ending Cash | $147,594 | $193,528 | $170,792 | $170,672 | $174,587 | $174,587 |
| **Operating Cash Account** | | | | | | |
| Beginning Balance | $88,205 | $546,636 | $721,068 | $329,193 | $135,975 | 88,205 |
| Transfers from Collateral | 458,431 | 734,743 | 789,769 | 843,772 | 861,611 | 3,688,327 |
| Disbursements - one day lag | - | (560,311) | (1,181,644) | (1,036,990) | (893,500) | (3,672,446) |
| Ending Operating Cash | $546,636 | $721,068 | $329,193 | $135,975 | $104,086 | $104,086 |

Confidential

# Gomes Enterprises
## Projected Cash Flow and Availability
### As of 2/10

| Week Ending | | 12-Feb | 19-Feb | 26-Feb | 5-Mar | 12-Mar | Total |
|---|---|---|---|---|---|---|---|
| **Availability** | | | | | | | |
| Beginning AR | | 2,830,402 | 2,830,402 | 2,834,175 | 3,166,941 | 3,259,290 | 2,830,402 |
| Sales | | - | 784,450 | 1,099,800 | 936,000 | 936,000 | 3,756,250 |
| Collections | | - | (780,677) | (767,033) | (843,651) | (865,527) | (3,256,889) |
| Ending AR | | 2,830,402 | 2,834,175 | 3,166,941 | 3,259,290 | 3,329,763 | 3,329,763 |
| Ineligible | | 495,320 | 495,981 | 601,719 | 619,265 | 632,655 | 632,655 |
| **Available at** | 80% | **1,868,065** | **1,870,555** | **2,052,178** | **2,112,020** | **2,157,686** | **2,157,686** |
| Beginning Inventory | | 2,601,430 | 2,601,430 | 2,601,430 | 2,601,430 | 2,601,430 | 2,601,430 |
| Purchases | | - | 585,000 | 940,000 | 800,000 | 800,000 | 3,125,000 |
| Sales - COGS | | - | (585,000) | (940,000) | (800,000) | (800,000) | (3,125,000) |
| Ending Inventory | | 2,601,430 | 2,601,430 | 2,601,430 | 2,601,430 | 2,601,430 | 2,601,430 |
| Ineligible | | 102,758 | 102,758 | 102,758 | 102,758 | 102,758 | 102,758 |
| **Available at** | 60% | **1,499,203** | **1,499,203** | **1,499,203** | **1,499,203** | **1,499,203** | **1,499,203** |
| **Total Available** | | **3,367,269** | **3,369,758** | **3,551,381** | **3,611,223** | **3,656,890** | **3,656,890** |
| Outstanding Loan | | 13,142,893 | 13,136,893 | 13,121,893 | 13,106,893 | 13,091,893 | 13,142,893 |
| Daily Reduction | | (6,000) | (15,000) | (15,000) | (15,000) | (15,000) | (66,000) |
| **Ending Loan** | | **13,136,893** | **13,121,893** | **13,106,893** | **13,091,893** | **13,076,893** | **13,076,893** |
| Excess/Shortfall | | (9,769,624) | (9,752,135) | (9,555,512) | (9,480,670) | (9,420,003) | (9,420,003) |
| Allowed | | (9,794,000) | (9,779,000) | (9,764,000) | (9,749,000) | (9,734,000) | (9,728,000) |
| Excess Availability | | 24,376 | 26,865 | 208,488 | 268,330 | 313,997 | 307,997 |

## Gomes Enterprises
### Projected Cash Flow and Availability

| Week Ending<br>Distribution Detail | As of 2/10<br>12-Feb | 19-Feb | 26-Feb | 5-Mar | 12-Mar | Total |
|---|---|---|---|---|---|---|
| Metal Purchases - Dealers/Brokers | - | 428,500 | 720,000 | 580,000 | 505,000 | 2,233,500 |
| Dock | - | 175,000 | 250,000 | 250,000 | 250,000 | 925,000 |
| Payroll | - | 38,000 | 30,000 | 30,000 | 30,000 | 128,000 |
| Employee Benefits | | | 23,020 | | 10,000 | 33,020 |
| Freight, Trucking & Transport | - | 35,000 | 35,000 | 35,000 | 35,000 | 140,000 |
| MPL | - | 15,000 | 5,000 | 5,000 | 5,000 | 30,000 |
| Legal | - | 35,000 | 10,000 | 10,000 | 10,000 | 65,000 |
| Property Leases | - | - | 21,000 | 16,500 | - | 37,500 |
| Interest Payment - US Bank | - | 20,000 | - | 75,000 | - | 95,000 |
| Truck and Yard Expenses | | 10,000 | 18,000 | 18,000 | 18,000 | 64,000 |
| Utilities | | 3,000 | 15,300 | 7,500 | 10,000 | 35,800 |
| Office Expense | | 3,000 | 5,000 | 5,000 | 5,000 | 18,000 |
| US Bank Loan Reduction | 6,000 | 15,000 | 15,000 | 15,000 | 15,000 | 66,000 |
| | 6,000 | 777,500 | 1,147,320 | 1,047,000 | 893,000 | 3,870,820 |

EXHIBIT "C"

# AMENDED AND RESTATED BUSINESS SECURITY AGREEMENT

This AMENDED AND RESTATED BUSINESS SECURITY AGREEMENT is made as of the 16th day of October, 2006, by Gomes Enterprises, LLC, a California limited liability company ("Debtor"), in favor of U.S. Bank National Association ("Secured Party"), and amends and restates that certain Business Security Agreement by Debtor in favor of Secured Party, dated as of October 3, 2003.

## 1. SECURITY INTEREST

To secure payment and performance of the Obligations defined below, Debtor grants Secured Party a security interest in all of the property described below in which Debtor has or acquires an interest, wherever located, whether now owned or hereafter arising or acquired, ("Collateral"):

(a) All equipment, fixtures, and inventory (including all goods held for sale, lease or demonstration or to be furnished under contracts of service, goods leased to others, trade-ins and repossessions, raw materials, work in process and materials or supplies used or consumed in Debtor's business), including all spare and repair parts, special tools, equipment and replacements for any of the foregoing, and any software embedded therein or related thereto;

(b) All accounts (including health-care-insurance receivables), contract rights, documents, chattel paper (including electronic chattel paper), instruments (including promissory notes), and general intangibles (including all payment intangibles), and all returned or repossessed goods the sale of which gave rise to any of the foregoing;

(c) All financial assets, investment property, securities (whether certificated or uncertificated, and including investment company securities), security entitlements, securities accounts, commodity contracts, and commodity accounts, including all substitutions and additions thereto, and all dividends, distributions and sums distributable or payable from, upon or in respect of such property;

(d) All commercial tort claims;

(e) All deposit accounts and all cash balances from time to time credited to such accounts;

(f) All letter-of-credit rights (whether or not the letter of credit is evidenced by a writing);

(g) All other contract rights or rights to the payment of money;

(h) All insurance claims and proceeds;

(i) All supporting obligations that support the payment or performance of any of the foregoing; and

(j) All additions and accessions to, all proceeds, products, offspring and profits of, and all rights and privileges incident to, any of the foregoing:

The term "Obligations" is used herein in its most comprehensive sense and includes (without limitation) any and all present and future debts, obligations and liabilities of Debtor to Secured Party pursuant to that certain Amended and Restated Credit Agreement of even date herewith between Debtor and Secured Party, as the same may be amended, renewed, modified or extended from time to time (the "Credit Agreement"), and any and all other debts, obligations, and liabilities of Debtor to Secured Party, heretofore, now or hereafter made, incurred, or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, whether Debtor is liable individually or jointly with others, whether for principal, interest or other debts, obligations or liabilities, and whether or not any or all such debts, obligations and liabilities are or become barred by any statute of limitations or otherwise unenforceable, including (without limitation) all obligations of Debtor under this Agreement, all obligations with respect to overdrafts in deposit accounts, letters of credit and bankers' acceptances, foreign exchange contracts, and interest rate, commodity, and foreign currency swap, cap, floor, collar, option and other derivative transactions, and including any of the foregoing that arise after the filing of a petition by or against Debtor under the United States Bankruptcy Code.

## 2. DEBTOR'S WARRANTIES

In order to induce Secured Party to extend credit to Debtor, Debtor warrants that while any of the Obligations are unpaid:

(a) <u>Ownership and Perfection</u>. Debtor is the owner of the Collateral free of all encumbrances and security interests except Secured Party's security interest and Permitted Liens, as defined in the Credit Agreement. Secured Party has a valid and perfected security interest in the Collateral. Chattel paper constituting Collateral evidences a perfected security interest in the goods covered by it, free from all other encumbrances and security interests.

(b) <u>Other Financing</u>. Unless waived by Secured Party in writing, no financing statement (other than Secured Party's) is on file covering the Collateral or its products or proceeds.

(c) <u>Documents</u>. If inventory is represented or covered by documents of title, Debtor is the owner of the documents, free of all encumbrances and security interests other than Secured Party's security interest.

(d) <u>Condition</u>. The inventory is in good condition and, in the case of goods held for sale (other than trade-ins or repossessed goods), is new and unused except as Secured Party may otherwise consent in writing.

(e) <u>Sale of Goods or Services Rendered</u>. Each account and chattel paper constituting Collateral arose from the performance of services by Debtor or from a bona fide sale or lease of goods, which have been delivered or shipped to the account debtor and for which Debtor has genuine invoices, shipping documents or receipts.

(f) <u>Enforceability</u>. Each account, contract right and chattel paper constituting Collateral is genuine and (except as disclosed to Secured Party in writing) enforceable against the account debtor according to its terms. It and the transaction out of which it arose comply with all applicable laws and regulations. The amount represented by Debtor to Secured Party as owing by each account debtor is the amount actually owing and is not subject to setoff, credit, allowance or adjustment, except discount for prompt payment, nor (except as disclosed to Secured Party in writing) has any account debtor returned the goods or disputed its liability. There has been no default as of the date of this Agreement according to the terms of any Collateral and no step has been taken to foreclose the security interest it evidences or otherwise enforce its payment. As of the date of this Agreement Debtor has no notice or knowledge of anything which might impair the credit standing of any account debtor.

(g) <u>Authority to Contract</u>. The execution and delivery of this Agreement and any instruments evidencing Obligations will not violate or constitute a breach of Debtor's articles of organization or operating agreement or any agreement or restriction to which Debtor is a party or is subject.

(h) <u>Accuracy of Information</u>. All information, certificates or statements given to Secured Party pursuant to this Agreement shall be true and complete when given.

(i) <u>Fixtures</u>. No Collateral shall be attached to real estate other than the locations set forth on Exhibit A.

(j) <u>Form of Organization; Names and Addresses</u>. Debtor is a limited liability company organized under the laws of the State of California. The name appearing below is the correct and exact name of Debtor as it appears in the public records of such state. Except as set forth on Exhibit A, Debtor does not do business under any other name, tradename or tradestyle, and has not done business under any other name, tradename or tradestyle within the past five (5) years. The address appearing below Debtor's signature is Debtor's chief executive office. Debtor shall advise Secured Party in writing at least thirty (30) days before any change of name, identity, form of organization, state of organization, corporate structure, or chief executive office.

The addresses where the Collateral will be kept, if different from that appearing below Debtor's signature, are set forth in Exhibit A. No Collateral will be kept at any other location without the prior written consent of Secured Party, but the parties intend that the Collateral, wherever located, is covered by this Agreement.

(k) <u>Fair Labor Standards Act</u>. All inventory has been and will be produced in compliance with all applicable requirements of sections 6, 7 and 12 of the Fair Labor Standards Act, as amended, and all regulations and orders of the United States Department of Labor issued under section 14 thereof.

(l) <u>Environmental Laws</u>. (i) No substances or materials have been, are or will be stored, deposited, treated, recycled or disposed of on, under or at any real estate now or at any time owned or occupied by Debtor ("Property") which substances or materials, if known to be present on, at or under the Property, would require cleanup, removal or some other remedial

action under any federal, state or local laws, regulations, ordinances, codes or rules relating to the discharge of air pollutants, water pollutants, or process wastewater or otherwise relating to hazardous or toxic substances or materials ("Environmental Laws"), (ii) there are no conditions existing currently or likely to exist during the term of this Agreement which would subject Debtor to damages, penalties, injunctive relief or cleanup costs under Environmental Laws, and (iii) Debtor is not subject to any judgment, decree, order or citation relating to or arising out of Environmental Laws.

### 3. SALE AND COLLECTIONS

(a) _Proceeds of Collateral_. So long as no default exists under any of the Obligations or this Agreement, Debtor may, (1) sell inventory in the ordinary course of Debtor's business for cash or on terms approved by Secured Party, at prices not less than the minimum sale price shown on instruments evidencing Obligations and describing inventory, or (2) with the prior written consent of Secured Party, lease inventory on terms approved by Secured Party. At any time after the occurrence and during the continuance of a default or event of default under any of the Obligations, all proceeds of Collateral received by Debtor shall be held by Debtor upon an express trust for Secured Party, shall not be commingled with any other funds or property of Debtor, and shall be turned over to Secured Party not later than the business day following the day of their receipt. All proceeds received by Secured Party shall be applied against the Obligations in such order and at such times as Secured Party shall determine, except that if any of the Obligations are incurred as all or part of the price of any Collateral or to enable the Debtor to acquire rights in or use of any Collateral ("Purchase-Money Obligations"), all payments made by Debtor will be applied first to Obligations which are not Purchase-Money Obligations, and then to Purchase-Money Obligations in the order which such Purchase-Money Obligations were incurred.

(b) _Verification and Notification_. Secured Party may verify accounts, chattel paper and contract rights in any manner, and Debtor shall assist Secured Party in so doing. Secured Party may at any time and Debtor shall, upon request of Secured Party, notify the account debtors to make payment directly to Secured Party and Secured Party may enforce collection of, settle, compromise, extend or renew the indebtedness of such account debtors. Until account debtors are otherwise notified, Debtor, as agent of Secured Party, shall make collections on the Collateral.

### 4. DEBTOR'S COVENANTS

Debtor agrees:

(a) _Maintenance of Collateral_. Debtor shall: maintain the Collateral in good condition and repair and not permit its value to be impaired; keep it free from all liens, encumbrances and security interests (other than Secured Party's security interest); defend it against all claims and legal proceedings by persons other than Secured Party; pay and discharge when due all taxes, license fees, levies and other charges upon it; not sell, lease, license or otherwise dispose of it or permit it to become a fixture or an accession to other goods, except for sales or leases of inventory authorized as provided in this Agreement; not permit it to be used in violation of any applicable law, regulation or policy of insurance; and, as to Collateral consisting

of instruments and chattel paper, preserve rights in it against prior parties. Loss of or damage to the Collateral shall not release Debtor from any of the Obligations.

(b) <u>Insurance</u>. Unless otherwise agreed in writing by Secured Party, Debtor shall keep the Collateral and Secured Party's interest in it insured under policies with such provisions, for such amounts and by such insurers as shall be satisfactory to Secured Party from time to time, and shall furnish evidence of such insurance satisfactory to Secured Party. Debtor assigns (and directs any insurer to pay) to Secured Party the proceeds of all such insurance and any premium refund, and authorizes Secured Party to endorse in the name of Debtor any instrument for such proceeds or refunds and, at the option of Secured Party, to apply such proceeds and refunds to any unpaid balance of the Obligations whether or not due, and/or to restoration of the Collateral, returning any excess to Debtor. Secured Party is authorized, in the name of Debtor or otherwise, to make, adjust, settle claims under and/or cancel any insurance on the Collateral.

(c) <u>Maintenance of Security Interest</u>. Where Collateral is in the possession of a third party, Debtor will join with Secured Party in notifying the third party of Secured Party's security interest and obtaining an acknowledgement from the third party that it is holding the Collateral for the benefit of Secured Party. Secured Party may at any time notify any such third party of its security interest. Debtor will cooperate with Secured Party in obtaining control agreements ("Control Agreements") in form and substance satisfactory to Secured Party with respect to Collateral consisting of deposit accounts, investment property, letter-of-credit rights, and electronic chattel paper.

Debtor shall pay all expenses and, upon request, execute and deliver any further documents and take any further actions reasonably deemed advisable by Secured Party to preserve the Collateral or to establish, determine priority of, perfect, continue perfected, terminate and/or enforce Secured Party's interest in it or rights under this Agreement. A carbon, photographic or other reproduction of this Agreement or any financing statement shall be sufficient as a financing statement.

(d) <u>Collateral Records and Statements</u>. Debtor shall keep accurate and complete records respecting the Collateral in such form as Secured Party may approve. At such times as Secured Party may require, Debtor shall furnish to Secured Party a statement certified by Debtor and in such form and containing such information as may be prescribed by Secured Party, showing the current status and value of the Collateral. Debtor shall furnish to Secured Party financial statements at least annually and such other financial information respecting Debtor at such times and in such form as Secured Party may request.

(e) <u>Inspection of Collateral</u>. At reasonable times, Secured Party may examine the Collateral and Debtor's records pertaining to it, wherever located, and make copies of records. Debtor shall assist Secured Party in so doing.

(f) <u>Chattel Paper</u>. Chattel Paper constituting Collateral shall be on forms approved by Secured Party. Debtor shall promptly mark all such chattel paper, and all copies, to indicate conspicuously the Secured Party's interest and, upon request, deliver them to Secured Party.

MILW_2144425.2

(g) <u>Modifications</u>. Without the prior written consent of Secured Party, Debtor shall not alter, modify, extend, renew or cancel any Collateral.

(h) <u>Returns and Repossessions</u>. Debtor shall promptly notify Secured Party of the return to or repossession by Debtor of goods underlying any Collateral and Debtor shall hold and dispose of them only as Secured Party directs.

(i) <u>United States Contracts</u>. If any accounts or contract rights constituting Collateral arise out of contracts with the United States or any of its departments, agencies or instrumentalities, Debtor will notify Secured Party and execute writings required by Secured Party in order that all money due or to become due under such contracts shall be assigned to Secured Party and proper notice of the assignment given under the Federal Assignment of Claims Act.

(j) <u>Taxes and Other Charges</u>. Debtor shall pay and discharge all lawful taxes, assessments and governmental charges upon Debtor or against its properties prior to the date on which penalties attach, unless and to the extent only that such taxes, assessments and charges are contested in good faith and by appropriate proceedings by Debtor.

## 5. RIGHTS OF SECURED PARTY

(a) <u>Authority to Perform for Debtor</u>. If Debtor fails to act as required by this Agreement or the Obligations, Secured Party is authorized, in Debtor's name or otherwise, to take any such action including, without limitation, signing Debtor's name or paying any amount so required, and the cost shall be one of the Obligations secured hereby and shall be payable by Debtor upon demand with interest from the date of payment by Secured Party at the highest rate then payable on the Obligations.

(b) <u>Charging Debtor's Credit Balance</u>. Without limiting the generality of section 1(e) above, Debtor grants Secured Party, as security for the Obligations, a security interest and lien in any credit balance and other money now or hereafter owed Debtor by Secured Party, including deposit accounts and certificates of deposit, and, in addition, agrees that Secured Party may, without prior notice or demand, charge against any such credit balance or other money any amount owing upon the Obligations, whether due or not.

(c) <u>Power of Attorney</u>. Debtor irrevocably appoints any officer of Secured Party as Debtor's attorney, with power (exercisable at any time after default) to receive, open and dispose of all mail addressed to Debtor; to notify the Post Office authorities to change the address for delivery of all mail addressed to Debtor to such address as Secured Party may designate; and to endorse the name of Debtor upon any instruments which may come into Secured Party's possession.

The power of attorney created by this section 5(c) is coupled with an interest and may not be revoked by Debtor. All acts of such attorney are ratified and approved. Such attorney is not liable for any act or omission or for any error of judgment or mistake of fact or law taken without willful misconduct.

MILW_21-44425.2

(d) <u>Nonliability of Secured Party</u>. Secured Party has no duty to protect, insure, collect or realize upon the Collateral or preserve rights in it against prior parties. Debtor releases Secured Party from any liability for any act or omission relating to the Obligations, the Collateral or this Agreement, except Secured Party's willful misconduct.

(e) <u>Financing Statements</u>. Debtor authorizes Secured Party to prepare and file financing statements describing the Collateral and all statutory liens held by Secured Party in such jurisdictions as Secured Party deems appropriate. Such financing statements may refer to the Collateral as "all personal property" or otherwise use a generic and comprehensive description of the Collateral.

(f) <u>Debtor's Waivers</u>. Debtor, for itself and all who may claim under the Debtor, as far as the Debtor now or hereafter lawfully may, waives all right to have all or any portion of the Collateral marshalled upon any foreclosure hereof and agrees that any court having jurisdiction over this Agreement may order the sale of all or any portion of the Collateral as an entirety. Any sale of, or the grant of options to purchase (for the option period thereof or after exercise thereof), or any other realization upon or disposition of, all or any portion of the Collateral under Section 6, subject to the rights afforded to the Debtor under the Uniform Commercial Code, shall operate to divest all right, title, interest, claim and demand, either at law or in equity, of the Debtor in and to the Collateral so sold, optioned, realized upon or disposed of, and shall be a perpetual bar both at law and in equity against the Debtor and against any and all persons claiming or attempting to claim the Collateral so sold, optioned, realized upon or disposed of or any part thereof, from, through and under the Debtor. No delay on the part of the Secured Party in exercising any power of sale, lien, option or other right hereunder and no notice or demand which may be given to or made upon the Debtor with respect to any power of sale, lien, option or right hereunder shall constitute a waiver thereof, or limit or impair the right of the Secured Party to take any action or to exercise any power of sale, lien, option or any other right under this Agreement or the Credit Agreement, or otherwise, nor shall any single or partial exercise thereof, or the exercise of any power, lien, option or other right under this Agreement or otherwise, all without notice or demand (except as otherwise provided by the terms of this Agreement), prejudice its rights against the Debtor in any respect. Each and every remedy given the Secured Party shall, to the extent permitted by law, be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

## 6. DEFAULT

Upon the occurrence of any Event of Default, as defined in Article VII of the Credit Agreement, or any other default under any instrument, document or agreement evidencing or governing any of the Obligations, all of the Obligations shall, at the option of Secured Party and without notice or demand, become immediately payable; and Secured Party shall have all rights and remedies for default provided by the Uniform Commercial Code, as well as any other applicable law and the Obligations, including the right to give notices of exclusive control and exercise all other rights and remedies under all Control Agreements. With respect to such rights and remedies,

(a) <u>Repossession</u>. Secured Party may enter into premises where any Collateral may be located, and may take possession of Collateral, all without notice or hearing.

- 7 -

MILW_2144425.2

(b) <u>Assembling Collateral</u>. Secured Party may require Debtor to assemble the Collateral and to make it available to Secured Party at any convenient place designated by Secured Party. It is agreed that Secured Party will not have an adequate remedy at law if this obligation is breached, and accordingly that Debtor's obligation to assemble Collateral shall be specifically enforceable.

(c) <u>Notice of Disposition</u>. Written notice, when required by law, sent to any address of Debtor in this Agreement at least 10 calendar days (counting the day of sending) before the date of a proposed disposition of the Collateral is reasonable notice.

(d) <u>Disposition</u>. Secured Party may sell Collateral on credit (and reduce the Obligations only when payment is actually received from the buyer) at wholesale and with or without an agent or broker; and Secured Party may but need not complete, process or repair any Collateral prior to disposition.

(e) <u>Expenses and Application of Proceeds</u>. Debtor shall reimburse Secured Party for any expense incurred by Secured Party in protecting or enforcing its rights under this Agreement before and after judgment including, without limitation, reasonable attorneys' fees and legal expenses and all expenses of taking possession, holding, preparing for disposition and disposing of the Collateral. After deduction of such expenses, Secured Party may apply the proceeds of disposition to the other Obligations in such order and amounts as it elects, subject only to section 3(a) above.

(f) <u>Waiver</u>. Secured Party may permit Debtor to remedy any default without waiving the default so remedied, and Secured Party may waive any default without waiving any other subsequent or prior default by Debtor.

(g) <u>No Obligation to Pursue Others</u>. Secured Party has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Secured Party may release, modify or waive any collateral provided by any other person to secure any of the Obligations, all without affecting Secured Party's rights against Debtor. Debtor waives any right it may have to require Secured Party to pursue any third person for any of the Obligations.

(h) <u>Compliance with Other Laws</u>. Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral, and such compliance will not be considered adversely to affect the commercial reasonableness of any such disposition.

(i) <u>Warranties</u>. Secured Party may sell or otherwise dispose of Collateral without giving any warranties as to the Collateral and may specifically disclaim any warranties of title or the like, all without being deemed to have impaired the commercial reasonableness of any disposition of Collateral.

(j) <u>Sales on Credit</u>. If Secured Party sells any of the Collateral on credit, Debtor will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and Debtor shall be credited with the proceeds of such resale.

MILW_2144425.2

### 7. PERSONS BOUND

This Agreement benefits Secured Party, its successors and assigns, including every holder or owner of any of the Obligations, binds the Debtor and its heirs, personal representatives and successors. Debtor may not assign this Security Agreement without the prior written consent of Secured Party.

### 8. INTERPRETATION

The validity, construction and enforcement of this Agreement are determined and governed by the internal laws of the State of California. All terms not otherwise defined have the meanings assigned to them by Articles 1 and 9 of the Uniform Commercial Code of the State of California, as it may be amended, reenacted or otherwise in effect from time to time. Invalidity of any provision of this Agreement shall not affect the validity of any other provision. This Agreement amends and restates that certain Business Security Agreement dated October 3, 2003 by Debtor in favor of Creditor. Any amendment or modification of this Security Agreement must be made in writing and signed by the Secured Party.

### 9. **CONSENT TO JURISDICTION**

**Debtor hereby consents to the exclusive jurisdiction of any state or federal court situated in Los Angeles, California, and waives any objection based on lack of personal jurisdiction, improper venue or *forum non conveniens*, with regard to any actions, claims, disputes or proceedings relating to this Agreement, any Collateral, or any document delivered hereunder or in connection herewith, or any transaction arising from or connected to any of the foregoing. Debtor waives personal service of any and all process, and consents to all such service of process made by mail or by messenger directed to the address specified below.** Nothing herein shall affect the Secured Party's right to serve process in any manner permitted by law, or limit the Secured Party's right to bring proceedings against Debtor or its property or assets in the competent courts of any other jurisdiction or jurisdictions.

### 10. **WAIVER OF JURY TRIAL**

**Debtor hereby waives any and all right to trial by jury in any action or proceeding relating to this Agreement, any Collateral, or any document delivered hereunder or in connection herewith, or any transaction arising from or connected to any of the foregoing. Debtor represents that this waiver is knowingly, willingly and voluntarily given.**

### 11. **LIMITATION OF LIABILITY**

**Debtor hereby waives any right it may now or hereafter have to claim or recover from the Secured Party any consequential, exemplary or punitive damages.**

MILW_2144425.2

Signed and Sealed on this 16th day of October, 2006.

GOMES ENTERPRISES, LLC

By: _____
David Gomes, Managing Member

And: _____
Sam Lee, Member

And: _____
Seong (Steve) Hwang, Member

Address:  400 East Weber Avenue
          Compton, CA  90222

**[Signature page to Amended and Restated Business Security Agreement of Gomes Enterprises, LLC]**

MILW_2144425.2

## EXHIBIT A

1. Addresses where collateral will be kept:

400 East Weber Avenue, Compton, California 90222

1906-1910 East Olympic Boulevard, Los Angeles, California 90021

2. Names and tradenames:

A to Z Metals

3. Prior names and tradenames:

None